MICHAEL C. ORMSBY
United States Attorney
Eastern District of Washington
Tyler H.L. Tornabene
Assistant United States Attorney
Post Office Box 1494
Spokane, WA 99210-1494
Telephone:  (509) 353-2767

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA ex. rel. SALINA SAVAGE, SAVAGE LOGISTICS LLC, <br><br> Plaintiff, <br><br> vs. <br><br> WASHINGTON CLOSURE HANFORD LLC, FEDERAL ENGINEERS AND CONSTRUCTORS, INC.,  SAGE TEC LLC, and LAURA SHIKASHIO, <br><br> Defendants. | CV-10-5051-EFS <br><br> United States' Complaint in Partial Intervention <br><br> **JURY TRIAL DEMANDED** |

The United States of America, by and through MICHAEL C. ORMSBY,
United States Attorney, for the Eastern District of Washington, and Tyler H.L.
Tornabene, Assistant United States Attorney for the Eastern District of Washington,
hereby alleges, avers, and claims against the above named Defendants as follows:

## I.    INTRODUCTION

1.1    This is an action brought by the UNITED STATES OF AMERICA
(herein "the UNITED STATES") to recover all damages, obtain disgorgement of
monies, and impose civil penalties resulting from the knowing false and/or fraudulent
claims, records, and/or statements made, used, or caused to be made or used by the
Defendants named in this Complaint (herein collectively "the DEFENDANTS" where

appropriate) claiming credit for doing tens of millions of dollars-worth of federal subcontracting business small businesses with woman owned small businesses when in truth and in fact, as the DEFENDANTS all knew, that was not occurring.

1.2    The UNITED STATES alleges, as detailed below, that WASHINGTON CLOSURE HANFORD LLC (herein "WCH") falsely claimed small business credit for millions of dollars-worth of modifications on a subcontract held by Phoenix Enterprises Northwest (herein "Phoenix") knowing that Phoenix did not qualify as a small business, knowing that the United States Small Business Administration (herein "SBA") had specifically determined that Phoenix did not so qualify, and after advising the United States Department of Energy (herein "DOE"), and later the Department of Energy Office of Inspector General, that it would not and did not claim small business credit for Phoenix.  As a result of WCH's false and/or fraudulent representations and conduct, and the UNITED STATES' reliance thereon through DOE, the UNITED STATES through DOE was falsely and/or fraudulently induced to (1) believe that WCH was in compliance with its small business subcontracting plan; (2) reimburse WCH for the full cost of the Phoenix subcontract modifications; and (3) not reduce WCH's fee for falsely claimed small business credit and/or not implementing its own small business subcontracting plan in good faith and in accordance with all applicable SBA requirements.

1.3    The UNITED STATES further alleges, as detailed below, that WCH, FEDERAL ENGINEERS AND CONSTRUCTORS, INC. (herein "FE&C"), SAGE TEC LLC (herein "SAGE TEC"), and the owner, operator, president, and at times sole employee of SAGE TEC, LAURA SHIKASHIO, knowingly submitted false claims to DOE whereby WCH falsely claimed Woman Owned Small Business (herein "WOSB") credit for tens of millions of dollars of subcontracting work it claimed was done by SAGE TEC when in truth and in fact, as the DEFENDANTS all knew, the work was performed by FE&C using SAGE TEC, and its WOSB status, as a pass through company which merely used FE&C's employees.  As a result of the

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 2

DEFENDANTS' false and/or fraudulent representations and conduct, and the UNITED STATES' reliance thereon through DOE, the UNITED STATES through DOE was falsely and/or fraudulently induced to (1) believe that WCH was in compliance with its small business subcontracting plan; (2) to reimburse WCH for the full cost of the SAGE TEC subcontracts; and (3) to not reduce WCH's fee  for falsely claiming WOSB credit and/or not implementing its own small business subcontracting plan in good faith and in accordance with all applicable SBA requirements.

## II.    JURISDICTION AND VENUE

2.1    The UNITED STATES re-alleges and incorporates by reference paragraphs 1.1 and 1.3 of this Complaint.

2.2    This civil action seeks the recovery of damages, civil penalties and disgorgement of monies obtained by the DEFENDANTS as a result of violations of the federal False Claims Act, 31 U.S.C. §§ 3729-33, for breach of contract, and for other violations of the common law that support causes of action for unjust enrichment, payment by mistake, and/or other legal and equitable remedies that are available to this Court.

2.3    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1345 and 31 U.S.C. § 3732(a).

2.4    Venue is proper in the Eastern District of Washington under 28 U.S.C. §§ 1391(b), (c), and 3732(a).  At all times material hereto, it is believed that the DEFENDANTS were located in and transacted business in the Eastern District of Washington.

## III.    THE PARTIES

3.1    The UNITED STATES re-alleges and incorporates by reference paragraphs 1.1 and 2.4 of this Complaint.

3.2    The Plaintiff in this action is the UNITED STATES OF AMERICA.

3.3    The United States Department of Energy (DOE) is a cabinet-level executive agency of the UNITED STATES headquartered in Washington, D.C.  The

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 3

DOE's mission is to ensure the country's security and prosperity by addressing its energy, environmental, and nuclear challenges through science and technology. The DOE is also responsible for the management, environmental restoration, and remediation of the UNITED STATES' legacy nuclear weapons production facilities, and the legacy waste generated from those facilities, in a manner protective of public and environmental health.

3.4     The United States Small Business Administration (SBA) is a cabinet level agency of the UNITED STATES headquartered in Washington, D.C. The SBA's mission is to preserve free competitive enterprise and to maintain and strengthen the overall economy of our nation by assisting in and facilitating the creation and growth of small businesses, a critical component of the country's economic strength and health.

3.5     During the relevant time period, Defendant Washington Closure Hanford LLC (WCH) was an entity incorporated in the State of Delaware with its principal place of business in Richland, Washington. Defendant WCH is owned by: (1) URS Corporation, an entity doing business in the Eastern District of Washington, incorporated in the State of Nevada, and with its headquarters in San Francisco, California; (2) Bechtel National, Inc., an entity doing business in the Eastern District of Washington, incorporated in the State of Nevada, and with its headquarters in San Francisco, California, and (3) CH2M Hill Companies Ltd., an entity doing business in the Eastern District of Washington, incorporated in the State of Delaware, and with its headquarters in Englewood, Colorado.

3.6     During the relevant time period, Defendant Federal Engineers and Constructors, Inc. (FE&C), was an entity incorporated in the State of Washington with its principal place of business in Richland, Washington.

3.7     During the relevant time period, Defendant Sage Tec LLC (SAGE TEC) was an entity incorporated in the State of Washington with its principal place of business in Richland, Washington.

3.8    During the relevant time period, LAURA SHIKASHIO was the owner, operator, president, and at times sole employee, of SAGE TEC and resided within the Eastern District of Washington.

3.9    During the relevant time period, Relator Salina Savage was a resident of the Eastern District of Washington and was an owner and principal officer of Relator Savage Logistics, LLC, an entity incorporated in the State of Washington with its principal place of business in Richland, Washington.

## IV.    THE FALSE CLAIMS ACT

4.1    The UNITED STATES re-alleges and incorporates by reference paragraphs 1.1 and 3.9 of this Complaint.

4.2    Originally enacted in the 1860s to combat fraud against the Union Army during the Civil War, the False Claims Act, 31 U.S.C. §§ 3729-3733, is the primary tool with which the UNITED STATES combats fraud against the Government and protects the federal fisc.  The Supreme Court has held that the False Claims Act's provisions must be construed broadly to reach "all types of fraud, without qualification, that might result in financial loss to the Government."  *United States v. Neifert-White*, 390 U.S. 228, 232, 88 S.Ct. 959 (1968).

4.3    The False Claims Act, at 31 U.S.C. § 3729(a)(1)(A) (formerly § 3729(a)(1) (2006)), provides that a person is liable to the UNITED STATES for each instance in which the person "knowingly presents, or causes to be presented, to an officer or employee of the United States Government . . . a false or fraudulent claim for payment or approval."

4.4    As amended by the Fraud Enforcement and Recovery Act of 2009 (FERA), the false statements provision of the False Claims Act establishes liability for any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(B).  The prior version of the false statements provision of the False Claims Act makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 5

or statement <u>to get a false or fraudulent claim paid or approved by the Government</u>." 31 U.S.C. § 3729(a)(2) (2006) (emphasis added to highlight altered language).

4.5    The False Claims Act defines "knowingly" at 31 U.S.C. § 3729(b) to mean that a person, with respect to information, "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information" and further provides that no proof of specific intent to defraud is required.

4.6    As amended on May 20, 2009, the False Claims Act defines the term "claim" to mean, in relevant part: "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that -- (i) is presented to an officer, employee, or agent of the United States; or, (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government --- (I) provides or has provided any portion of the money or property requested or demanded; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ."  31 U.S.C. § 3729(b)(2)(A).

4.7    Any person who violates the False Claims Act is liable to the UNITED STATES for a civil penalty of not less than $5,500 and not more than $11,000, plus three (3) times the amount of damages which the Government sustains because of the act of that person.  31 U.S.C. § 3729(a); 28 C.F.R. § 85.3(a)(9).

## V.    THE SMALL BUSINESS ACT

5.1    The UNITED STATES re-alleges and incorporates by reference paragraphs 1.1 and 4.7 of this Complaint.

5.2    Section 2 of the Small Business Act states:

The essence of the American economic system of private enterprise is free competition.  Only through full and free competition can free markets, free entry into business, and opportunities for the expression and growth of personal initiative and individual judgment be assured.  The preservation and expansion

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 6

of such competition is basic not only to the economic well-being but to the security of this Nation.  Such security and well-being cannot be realized unless the actual and potential capacity of small business is encouraged and developed. It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation.

15 U.S.C. § 631.  The Small Business Act provides that in order to be considered a small business, an entity must be "independently owned and operated."  15 U.S.C. § 632.

5.3    The Small Business Jobs Act of 2010, Public Law 111-240, codified at 15 U.S.C. § 632(w), states, in relevant part that "[i]n every contract [or] subcontract . . . which is set aside, reserved, or otherwise classified as intended for award to small business concerns, there shall be a presumption of loss to the United States based on the total amount expended on the contract [or] subcontract . . . whenever it is established that a business concern other than a small business concern willfully sought and received the award by misrepresentation."  15 U.S.C. § 632(w)(1)

5.4    15 U.S.C. § 632(w)(2) further states that:

The following actions shall be deemed affirmative, willful, and intentional certifications of small business size and status:

(A)    Submission of a bid or proposal for a Federal grant, contract, [or] subcontract . . . reserved, set aside, or otherwise classified as intended for award to small business concerns.

(B)    Submission of a bid or proposal for a Federal grant, contract, [or] subcontract . . . which in any way encourages a Federal agency to classify the bid or proposal, if awarded, as an award to a small business concern.

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 7

(C)    Registration on any Federal electronic database for the purpose of being considered for award of a Federal grant, contract, [or] subcontract . . .

5.5    For the purposes of federal procurement programs for which status as a small business is required, including the WOSB set-aside program, a concern must not exceed the size standard for the North American Industry Classification System (NAICS) code specified in the solicitation, whether the threshold is based upon number of employees or annual revenues.  13 CFR 121.401 *et seq.*  In order for a small-business government contractors to compete specifically as a WOSB, the business must, *inter alia*, also be owned and controlled by women, wherein at least 51 percent of the business is owned by women and the business' management and daily operations are controlled by women.   15 U.S.C. § 632(n); 13 C.F.R. 127.200; 127.202.

5.6    "Contractors acting in good faith may rely on written representations by their subcontractors regarding their status as . . . a small business concern owned and controlled by women."   15 U.S.C. § 637(d)(3)(F).

5.7    The Small Business Act encourages prime contractors to award subcontracts to small and other disadvantaged companies so that they will have the "maximum practicable opportunity to participate in the performance" of Federal contracts.  15 U.S.C. §  637(d)(1) provides:

It is the policy of the United States that small business concerns, small business concerns owned and controlled by veterans, small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women, shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency, including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems.

The Small Business Act also requires the above language be inserted into every federal prime contract (other than certain specified contracts not relevant here), and

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 8

further requires that every federal prime contract include a clause stating that "The contractor hereby agrees to carry out this policy in the awarding of subcontracts to the fullest extent consistent with the efficient performance of this contract."  15 U.S.C. § 637(d)(3).

5.8    The Small Business Act further emphasizes the importance of ensuring that small and other disadvantaged contractors participate in the performance of subcontracts by requiring prime contractors to submit subcontracting plans to the procuring agencies showing "percentage goals for the utilization" of these companies in performing the contract, 15 U.S.C. § 637(d)(4), (d)(6).

5.9    The Small Business Act also provides:  "The subcontracting plan shall be included in and made a material part of the contract. 15 U.S.C. § 637(d)(4)(B). Further, the subcontracting plan must contain assurances that each offeror or bidder will submit 'periodic reports … in order to determine the extent of compliance by the offeror or bidder with the subcontracting plan."  15 U.S.C. § 637(d)(6)(E).

5.10    The Small Business Act further states in 15 U.S.C. § 637(d)(4)(D) as follows:

> No contract shall be awarded to any offeror unless the procurement authority determines that the plan to be negotiated by the offeror pursuant to this paragraph provides the maximum practicable opportunity for small business concerns, qualified HUBZone small business concerns, small business concerns owned and controlled by veterans, small business concerns owned and controlled by service-disabled veterans, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women to participate in the performance of the contract.

5.11    The Small Business Act mandates that all federal prime contracts (other than certain specified contracts not relevant here) "shall contain a clause for the payment of liquidated damages upon a finding that a prime contractor has failed to make a good faith effort to comply with the requirements imposed on such contractor by this subsection."  15 U.S.C. § 637(d)(4)(F)(i).

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 9

5.12    Accordingly, the Small Business Act makes a prime contractor's representation that it is in compliance, and will remain in compliance with its small business subcontracting plan, a material condition of award and continuing performance.  15 U.S.C. § 637(d)(4)(B), (D).

5.13    The Small Business Act further provides that a prime contractor or subcontractor's failure to comply in good faith with a subcontracting plan and the policy encouraging the greatest possible participation in the performance of the by disadvantaged small businesses including WOSBs, constitutes a "material breach" of the contract or subcontract.  15 U.S.C. § 637(d)(9).

5.14    The Small Business Act further states that any small business concern that misrepresents its status as a WOSB shall be subject to penalties under the False Claims Act.   15 U.S.C. § 637(m)(5)(C).

## VI.    STATEMENT OF FACTS

6.1    The UNITED STATES re-alleges and incorporates by reference paragraphs 1.1 through 5.14 of this Complaint.

### A. The Cleanup Effort at Hanford and the River Corridor Closure Project.

6.2    DOE's Hanford Site is a 586 square-mile site located in the Eastern District of Washington.  The Hanford Site is a mostly decommissioned nuclear production complex that has been operating since the 1940s.  Established in 1943 as part of the Manhattan Project in the town of Hanford in south-central Washington, the site was home to the B Reactor, the first full-scale plutonium production reactor in the world.  Plutonium manufactured at the Hanford Site was used in the first nuclear bomb tested at the Trinity site in New Mexico, and in Fat Man, the atomic plutonium bomb detonated over Nagasaki, Japan.  During the Cold War, the project was expanded to include nine nuclear reactors and five large plutonium processing complexes, which produced plutonium for most of the 60,000 weapons in the United States' nuclear arsenal.  The Hanford Site currently houses approximately two-thirds of the United States' high-level radioactive waste by volume.  The DOE's Richland

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 10

Operations Office and the Office of River Protection, both located in Richland, Washington, in the Eastern District of Washington, oversee and manage the Hanford site.

6.3     During its plutonium production mission, the Columbia River was critical to the Hanford Site because river water was needed to cool down the nuclear reactors used to generate the plutonium.  As a result, all nine of the Hanford Site reactors were built in close proximity to the Columbia River in an area known as the 100 Area. Hanford's 300 Area, a complex of buildings used to conduct experiments as well as manufacture equipment for use throughout the Site, was also located near the river shore.  The Columbia River Corridor accounts for about 220 square miles of the Hanford Site.

6.4     At present, cleanup work to preserve and protect the Columbia River is the top priority at the Hanford Site.  Thousands of workers are involved in hundreds of projects designated to clean up existing contamination and waste sites that are close to the Columbia, to prevent contamination from reaching the river, and to demolish structures that are no longer in use

6.5     DOE describes the River Corridor Closure Project as the nation's largest environmental cleanup project.  According to DOE data, there are more than 760 solid and liquid waste sites associated with the project.  The soil underneath many of the waste sites also may be contaminated and must be cleaned up along with the material that caused the contamination in the first place.  Above ground, there are more than one thousand structures that must be removed. Some of these facilities are contaminated themselves, meaning that before any demolition is done, steps must be taken to ensure that neither the work crews nor the environment will be harmed during the work.

**B. The River Corridor Closure Contract.**

6.6     On March 23, 2005, DOE awarded WCH the River Corridor Closure Contract (herein "the RCC Contract"), a multi-billion dollar, ten-year contract for the

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 11

environmental restoration, cleanup, and closure of the Columbia River Corridor.  The RCC Contract required WCH to successfully "deactivate, decontaminate, decommission, and demolish excess facilities; place former production reactors in an interim safe and stable condition; remediate waste sites and burial grounds; meet regulatory requirements; and transition to long-term stewardship."

6.7    The RCC Contract was, at all times material to this Complaint, a cost-plus-incentive-fee contract, meaning that WCH was reimbursed for its material and labor costs incurred in furtherance of its designated scope of work under the RCC Contract.  The UNITED STATES paid WCH through a DOE-funded line of credit from which WCH drew down reimbursement of its incurred allowable costs.  WCH also earned incentive fee, or profit, in excess of its incurred costs earning either Cost Performance incentive fee or Schedule Performance incentive fee, which are calculated independently based on specific formulas and schedule milestones in the RCC Contract.

6.8    At present WCH has claimed and received $2,064,837,415.75 from DOE under the RCC Contract in reimbursement of its incurred costs.  In addition to WCH's recovery of its indirect and direct costs, WCH has claimed and received an additional $85,670,945 in performance incentive fee/profit from the UNITED STATES through DOE under the RCC Contract.

6.9    As a condition of receiving the RCC Contract, WCH was required to establish and implement a small business subcontracting plan, which required WCH to establish subcontracting goals for various programs including small businesses and disadvantaged small business, which included WOSBs.  Under the RCC Contract WCH committed to implementing its plan and to using good faith efforts to meet its goals in accordance with applicable SBA requirements, and to report regularly to DOE regarding its small business participation.  WCH's small business subcontracting plan was incorporated into the RCC Contract by reference and made part of the contract.

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 12

6.10   Under the RCC Contract, as mandated by statute, if WCH failed to carry out its small business subcontracting plan in good faith or failed to meet one or more of the goals, DOE could assess liquidated damages as well as reduce WCH's incentive fee payments by $3 million for each milestone.  *See* 15 U.S.C. § 637(d)(4)(F)(i).

6.11   Additionally, as mandated by statute, failure to carry out the small business subcontract requirements found in the RCC Contract or the commitments in WCH's small business subcontracting plan constituted a material breach of the RCC Contract.  *See* 15 U.S.C. § 637(d)(4)(B),(D).

**C. Between at Least May of 2009 and August of 2013, WCH Failed to Carry Out a Small Business Subcontracting Plan in Good Faith and the DEFENDANTS Knowingly Violated SBA Statutes and Regulations, the RCC Contract, and the False Claims Act.**

6.12   Between at least May 2009 and August 2013, the DEFENDANTS knowingly violated SBA statutes and regulations and the terms of the RCC Contract, knowingly submitted and caused to be submitted false claims for payment, and knowingly made and used numerous false records and/or statements material to DOE's payment of false claims, all in violation of the False Claims Act.

**C.1    The "Truck & Pup" Subcontract to Phoenix.**

6.13   On April 9, 2009, WCH issued request for proposal (RFP) number R009166A00 indicating its intent to award a subcontract for "Transportation of Direct Loaded Bulk materials from 100 Area Waste Sites" to an area of the Hanford Site known as the ERDF or Environmental Restoration Disposal Facility, (herein "the Truck & Pup Subcontract").  WCH's solicitation noted that the subcontract was a "set-aside" meaning that only disadvantaged small businesses, including WOSBs, were eligible to bid on, be awarded, and perform the work.

6.14   On May 6, 2009, an entity known as Phoenix Enterprises NW (herein "Phoenix") submitted a final proposal for the Truck & Pup Subcontract.  Phoenix was established by Jonetta Everano, a FE&C Construction Services Manager, on February

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 13

19, 2009.  WCH awarded the Truck & Pup Subcontract to Phoenix on May 20, 2009.

At the time that WCH awarded the Truck & Pup Subcontract to Phoenix, Phoenix was

51% owned by Jonetta Everano and 49% owned by FE&C.

6.15   On May 25, 2009, relator Savage Logistics, LLC, filed a protest with the

SBA that Phoenix was not eligible for the Truck & Pup Subcontract because of its

affiliation with FE&C.  Notwithstanding the protest, on June 9, 2009, WCH falsely

entered the Truck & Pup Subcontract award to Phoenix into its "Costpoint"

accounting system as a small business award.

6.16   Following its review and analysis, on June 18, 2009, the SBA determined

that Phoenix was not an eligible small business for the Truck & Pup Subcontract due

to its affiliation with FE&C.  Specifically, the SBA determined that Phoenix was

affiliated with FE&C and therefore ineligible because: (1) Phoenix's owner, Jonetta

Everano, was a full-time FE&C employee; (2) Phoenix was located within FE&C

office space and had the same phone and fax numbers and mailing address as FE&C;

(3) the sublease provided by Phoenix in an attempt to show an arms-length

relationship between Phoenix and FE&C was only executed after the award of the

Truck & Pup Subcontract; (4) Phoenix used FE&C's insurance policy rather than

having its own policy; (5) FE&C prepared Phoenix's cost proposal for the Truck &

Pup Subcontract and Phoenix subcontracted with FE&C to provide "all plant, labor,

materials, tools, supplies, equipment, transportation, supervision, professional and

other services, and shall perform all operations necessary and required" to complete

"administrative support activities" on the Truck & Pup Subcontract; (6) Phoenix had

no employees and no receipts; (7) Bernie Laverentz, a FE&C vice president, was

designated to negotiate and make representations on Phoenix's behalf; (8) FE&C

provided all four "key personnel" identified in Phoenix's proposal as well as

numerous other personnel identified to perform and supervise work under the Truck &

Pup Subcontract; (9) Phoenix did not have a state Contractor's Registration and so

instead used FE&C's; (10) Phoenix used all FE&C policies, procedures, plans, and

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 14

programs regarding quality assurance, health and safety, and operations, policies and procedures that were key components of the RFP; (11) Phoenix did not have the qualifications or experience necessary to win the award and so instead relied on and referenced the qualifications, past performance, and experience of FE&C in order to meet the RFP's requirements; and (12) Phoenix used FE&C in-house counsel.

6.17    Notwithstanding the SBA's determination, rather than re-compete the work or award it to an eligible small business, WCH decided to proceed with the Truck & Pup Subcontract award to Phoenix but represented that it would not claim any small business credit for Phoenix.  WCH informed DOE of its intention and DOE, relying on WCH's representation that it would not claim any small business credit, allowed the Truck & Pup Subcontract to proceed.

6.18    WCH did not claim small business credit for the initial award to Phoenix of the Truck & Pup Subcontract.  However, WCH falsely claimed small business credit for subsequent modifications to the Truck & Pup Subcontract in the total amount of at least $2,779,581.10 in its submissions to DOE, including the semi-annual small business subcontract reports and "balanced scorecards" that WCH submitted to DOE in support of their contractual requirements regarding their small business subcontract plan and justifications for award fee from DOE for making good faith attempts to reach WCH's small business subcontracting goals.

6.19    WCH continued to falsely claim small business credit for Phoenix despite being fully aware that Phoenix had been determined to be other than small for purposes of the Truck & Pup Subcontract and that WCH therefore was not entitled to claim any small business credit for Phoenix.

6.20    Additionally, WCH later falsely represented to the Department of Energy Office of Inspector General that it had not claimed any small business credit for Phoenix on the Truck & Pup Subcontract when in fact it had.

6.21    The amounts and relevant dates for which WCH falsely claimed that Phoenix was a small business to DOE under the RCC Contract in multiple

modifications referenced in the table below, each one constituting a false claim under the False Claims Act:

| RFP No. | Line Description | Amount | P/O Line Date |
|---------|------------------|--------|---------------|
| S009166A00 | Modification No. 2-CN's 5-11 | 67,072.00 | 2/3/10 |
| S009166A00 | Modification No. 3-CN 12 Option 1 | 520,897.00 | 2/3/10 |
| S009166A00 | Funding added for CN 04 Contractor directed OT | 100,000.00 | 2/24/10 |
| S009166A00 | Modification No. 4-CN's 13-18 | 1,880,985.00 | 3/10/10 |
| S009166A00 | Add Funding for Contract Closeout | 205,308.10 | 7/6/10 |
| S009166A00 | Add Funding for Bonding Costs | 5,319.00 | 11/1/10 |
|  |  |  |  |
|  |  | Total: $2,779,581.10 |  |

6.22    Moreover, WCH continued to knowingly claim payment from DOE on the RCC Contract and including Phoenix in its computation of small business participation in support of its monthly payment requests for cost reimbursement and incentive fee, even though WCH knew that FE&C, not Phoenix, was performing all or substantially all of the work under the Truck & Pup Subcontract and that Phoenix was not an eligible small business for purposes of the Truck & Pup Subcontract.  These monthly invoice false claims from WCH are included in those detailed *infra* at paragraph 7.33.

6.23    The other false claims and false and/or fraudulent records or statements under the False Claims Act related to WCH's false and fraudulent representations regarding Phoenix and/or the Truck & Pup Subcontract are detailed *infra* in Section VII of this Complaint.

### C.2    WCH's Multimillion Dollar Subcontract Awards to SAGE TEC Falsely Claiming Woman Owned Small Business Credit.

6.24    After making numerous knowing false claims to DOE regarding Phoenix's small business status on the Truck & Pup Subcontract, WCH awarded two multimillion dollar subcontracts to SAGE TEC also under the RCC Contract falsely claiming to DOE that SAGE TEC, as a WOSB, would perform work on the contract

and not merely act as a pass through company for FE&C.  In fact, as the DEFENDANTS all knew, SAGE TEC used FE&C's employees to perform work on the subcontracts.  In this manner, as the DEFENDANTS all knew, SAGE TEC acted as a pass through company merely providing its WOSB name and status with FE&C actually performing the work.

6.25   WCH's resulting false claims to DOE were made by WCH and were caused to be made by FE&C, SAGE TEC, and LAURA SHIKASHIO.  The false claims to DOE included, as detailed *infra* in Section VII of this Complaint, false claims that WCH was complying in good faith with its small business subcontracting plan, false claims that WCH was not in breach of the RCC Contract and therefore was entitled to reimbursement for work performed under the contract including, but not limited to, full reimbursement for the subcontracts as well as payment of incentive fee under the RCC Contract.

> **C.2.1 WCH's First Multimillion Dollar Subcontract Award to SAGE TEC Falsely Claiming Woman Owned Small Business Credit.**

6.26   In May of 2010, WCH began the process of awarding a multi-million dollar subcontract on a restricted basis to disadvantaged small businesses, including WOSBs, for work on the RCC Contract.  The process began with a specific request for proposal provided only to businesses that WCH had pre-qualified, followed by detailed technical and commercial evaluations of the resulting proposals.

6.27 WCH ultimately awarded the subcontract to SAGE TEC teaming with FE&C.  WCH made this award despite knowing from its technical and commercial evaluations that SAGE TEC had no relevant experience, had no employees of its own other than its owner LAURA SHIKASHIO, had no equipment, was far too small of an operation to perform the work as required, and was going to act as a pass through for FE&C, merely providing its WOSB name and status with FE&C actually performing the work.

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 17

<u>WCH's 100 Area Request for Proposal (RFP) No. R015600A00.</u>

6.28    On May 18, 2010, WCH issued RFP No. R015600A00 for Remedial Action for 100-C-7 and 100-C-7:1 Waste Sites (herein the "100 Area RFP") on a restricted basis to small disadvantaged businesses, including WOSBs.

6.29    The 100 Area RFP was a request for proposal by WCH to award an initially expected four (4) month subcontract, for work on the RCC Contract to begin in November of 2010 with a scope of work that included remedial action on the 100-C-7 & 100-C-7:1 Waste Sites.  More specifically, the 100-C-7 Waste Site consisted of the residual sodium dichromate contamination associated with the concrete that was left in place after the 1997 decommissioning of the 183-C Filter Building /Pumproom. The 100-C-7:1 Waste Site was the stained surface soil that was observed in 2002 just north of the 183-C Headhouse and adjacent to the northwest corner of the 183-C Sedimentation Basins.

6.30  The subcontract contemplated in the 100 Area RFP required a subcontractor to furnish all management, supervision, labor, facilities, equipment, tools, materials and supplies necessary to safely complete the scope of work.

6.31    WCH provided a Prequalification Questionnaire to potential vendors which, among other things, stated the requirements that potential offerors must have "three (3) years experience in performing earthwork and grading type work in the past five years" must have "accumulated two (2) years experience performing work in zones of radiological contamination in the past five years" and must have "accumulated two (2) years experience performing waste handling work in the past five years."

6.32    In its response to WCH's prequalification questionnaire SAGE TEC explicitly advised that as a new business it did not meet any of the requirements for offerors other than having WOSB status and instead relied solely on the relevant experience of FE&C.

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 18

6.33    Just as with Phoenix (as found by the SBA in June of 2008 when determining that Phoenix not an eligible small business on the Truck & Pup Subcontract and was instead an affiliate of FE&C, *see* paragraphs 6.16 *supra*) SAGE TEC, explicitly provided to WCH in its January 2010 prequalification questionnaire response that it had merely adopted FE&C's Quality Assurance Program and had none of its own.

6.34    Despite SAGE TEC not meeting the basic qualifications to perform the work of the proposed subcontract as required in WCH's own prequalification questionnaire, as known to all of the DEFENDANTS, and despite SAGE TEC merely adopting FE&C's Quality Assurance Program having none of its own, also as known to all of the DEFENDANTS, WCH prequalified SAGE TEC as a potential vendor for the 100 Area RFP.

6.35    WCH initially pre-qualified a total of thirteen (13) potential vendors for the 100 Area RFP.  However, on July 19, 2010, it ultimately only received five (5) proposals from, among others, SAGE TEC (teaming with FE&C) and Phoenix.

<u>WCH's Technical Evaluation of SAGE TEC and FE&C on the 100 Area RFP</u>

6.36    WCH conducted a technical evaluation of both SAGE TEC's and the other offerors' proposals.  WCH's Technical Evaluation Team consisted of subject matter-experts from: WCH Project Management; WCH Engineering; WCH Design Engineering, WCH Quality Assurance, and WCH Health and Safety.

6.37    SAGE TEC submitted its technical proposal on the 100 Area RFP to WCH (herein SAGE TEC's 100 Area Technical Proposal) on July 19, 2010.

6.38    SAGE TEC's 100 Area Technical Proposal informed WCH that SAGE TEC, through LAURA SHIKASHIO, would provide "project management," and that LAURA SHIKASHIO would be "responsible for the overall implantation of corporate quality and safety programs."  That same proposal further informed WCH that FE&C was to provide "Construction, D&D, Remediation Services, and Labor," with two other named subcontractors to provide "Engineering/Design" and "Civil Survey."

6.39  SAGE TEC's 100 Area Technical Proposal provided that earlier that year SAGE TEC had completed two subcontracts with WCH worth a combined approximate value of $178,000.  That same proposal also provided that FE&C had two ongoing subcontracts with WCH with a combined approximate value of $11,800,000.00.

6.40   In the "Technical Qualifications of Organization" section of SAGE TEC's 100 Area Technical Proposal it did not mention one word about any qualification of SAGE TEC or LAURA SHIKASHIO to perform any work on the sought after subcontract but did describe FE&C's qualifications as "the nation's business leader in remediation of nuclear and hazardous waste sites."

6.41   LAURA SHIKASHIO, as the DEFENDANTS all knew, was not an engineer and, while having worked on the Hanford Site, her formal education consisted of a general social sciences degree.

6.42   As part of SAGE TEC's 100 Area Technical Proposal SAGE TEC provided the resumes of six (6) key personnel to WCH for the following positions: project manager, site superintendent, site health and safety officer certified industrial hygienist, industrial hygiene lead, and sampling technician.  All of the resumes for these key personnel showed that each were at that time working for FE&C and had been for years.

6.43 Although the project manager position, according to SAGE TEC's 100 Area Technical Proposal, would have "the authority to be the single point of contact on behalf of Sage Tec and negotiate all contract changes with WCH," LAURA SHIKASHIO was not listed as project manager; instead various current FE&C employees were listed.

6.44  SAGE TEC's 100 Area Technical Proposal provided the following information to WCH regarding equipment to be used to perform the work:

> FE&C will place as many of its own pieces of equipment on the project as are available when this project commences.  Then will bring additional pieces of

our equipment on site, to replace leased or rented equipment, as they become available from other projects.  FE&C will establish lease to purchase or straight purchase agreements for those items we do not own as we deem appropriate. FE&C has developed outstanding working relationships with equipment vendors, locally and within the region.  We have negotiated firm commitments for equipment and trailers.  We have established long term relationships with contractors to supply engineering, civil surveying and electrical installation.

6.45 SAGE TEC, as the DEFENDANTS all knew, had no equipment to contribute to the work on the sought after subcontract and ultimately did not contribute any equipment.

6.46   In determining the percentage of work that SAGE TEC supposedly was to complete SAGE TEC and LAURA SHIKASHIO relied on FE&C, specifically the cost estimating services of Jim Mortimer, a Vice President for FE&C.

<u>WCH's Commercial Evaluation of SAGE TEC and FE&C on the 100 Area RFP.</u>

6.47   WCH also engaged in a commercial evaluation of SAGE TEC's and other offerors' proposals provided under the 100 Area RFP.  This was a price evaluation by WCH, which, among other things, evaluated the price of the offers against each other.  WCH's price evaluation incorporated technical data as necessary to determine price difference rationale.

6.48   SAGE TEC submitted its commercial proposal (herein "SAGE TEC's 100 Area Commercial Proposal") to WCH on July 19, 2010.  That proposal authorized LAURA SHIKASHIO and Bernie Laverentz, a FE&C Vice President, as negotiators for SAGE TEC with WCH on the 100 Area RFP.

6.49   SAGE TEC's 100 Area Commercial Proposal provided financial statements to WCH showing that between January and June of 2010 it had a net income of $5,604.34 and that as of June 30, 2010 it had total assets of $51,207.47 with no equipment of any kind.

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 21

6.50 As part of SAGE TEC's 100 Area Commercial Proposal, LAURA SHIKASHIO provided a signed Representations and Certifications to WCH on behalf of SAGE TEC falsely claiming, as the DEFENDANTS all knew, that SAGE TEC was a WOSB and would be so acting if awarded the sought after subcontract, when in fact SAGE TEC, as the DEFENDANTS all knew, would be acting as a pass through company merely providing its WOSB name and status with FE&C actually performing the work.

6.51   SAGE TEC submitted its best and final offer to WCH on August 12, 2010.  After multiple amendments to the 100 Area RFP by WCH, SAGE TEC submitted a revised commercial proposal on November 2, 2010.

6.52   WCH's review of SAGE TEC's 100 Area Commercial Proposal included a Dun & Bradstreet report which gave SAGE TEC a "Risk of Financial Stress" score (the likelihood of a firm ceasing business without paying all creditors in full) indicating a "moderate risk of severe financial stress over the next 12 months."  That reported noted however that this risk factor was still less than other businesses within Dun & Bradstreet's database.  Nonetheless,  WCH concluded that, "Since Sage Tec will be partnered with a Subcontractor (Federal Engineering & Constructors) who has successfully completed subcontracts of similar volume and duration of work, it is believed that through careful monitoring of Sage Tec they would be capable of successfully performing on the proposed subcontract."

6.53 That same Dun & Bradstreet report of SAGE TEC, provided to WCH on or about November 8, 2010, explicitly stated that SAGE TEC had only one employee.

WCH's Award of the First Multi-Million Dollar Subcontract to SAGE TEC.

6.54   Despite knowing that SAGE TEC was proposing to lend merely its WOSB name and status to the subcontract, WCH falsely represented to DOE that SAGE TEC was the technically acceptable, responsive, responsible offeror with the lowest evaluated price.

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 22

6.55   On or about November 11, 2010, WCH entered into Subcontract No. C015600A00 (herein "the 100 Area Subcontract") with SAGE TEC.  The 100 Area Subcontract was initially awarded in an amount of $4,499,505.00 with work to be completed over an approximate 16 month period.   The 100 Area Subcontract was a fixed price subcontract.

SAGE TEC Acted as a Pass Through Company on the 100 Area Subcontract, and Merely Provided its WOSB Name and Status with FE&C Actually Performing the Work.

6.56   On April 29, 2011, during the 100 Area Subcontract, Kristin Hunt a WCH Cost Price Analyst/Subcontract Specialist sent an email to Dean N. Strom, the WCH Project Manager on the 100 Area Contract, Douglass C. Ordal, a WCH Senior Subcontract Specialist on the 100 Area Subcontract; Robert C. Gray a WCH Subcontract Administrative Engineer; and Ernest J. Biebrich, the Subcontract Technical Representative on the 100 Area Subcontract regarding the 100 Area Contract stating in pertinent in part:

> Sage Tec is proposing a 7.5% fee for passing through FE&Cs bid. . .I think it is reasonable to negotiate a lower rate since they are not adding any value to the contract other than a small business name. . .That is something the Doug will need to negotiate. .since we do not have the authority to do so.

(ellipses original).

6.57   SAGE TEC, as the DEFENDANTS all knew, did not perform the 100 Area Subcontract with its own employees.  Instead, SAGE TEC, as the DEFENDANTS all knew, used FE&C's employees to perform SAGE TEC's supposed portion of the work.

6.58   In using employees from FE&C, SAGE TEC merely paid invoices from FE&C for the charge out rate of any of FE&C's employees used by SAGE TEC. FE&C continued to pay the full wages and benefits of any of their employees used by SAGE TEC.

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 23

6.59    SAGE TEC, as the DEFENDANTS all knew, was acting merely as a pass through company on the 100 Area Subcontract, its only contribution being its WOSB name and status.

As a Result of SAGE TEC Acting as a Pass Through Company on the 100 Area Subcontract, and Merely Providing its WOSB Name and Status, the DEFENDANTS Submitted or Caused to be Submitted False Claims and Used, Made, or Caused to be Used or Made False Records or Statements.

6.60    The DEFENDANTS' specific false claims and false records or statements related to the 100 Area Subcontract are identified *infra* in Section VII of this Complaint.

6.61    The DEFENDANTS all knew that SAGE TEC was acting as a pass through company on the 100 Area Subcontract merely providing its WOSB name and status with FE&C actually performing the work.  The DEFENDANTS nonetheless repeatedly falsely and/or fraudulently represented to DOE that SAGE TEC was an eligible WOSB with respect to the 100 Area Subcontract and that, *inter alia*, WCH was entitled to WOSB credit and was implementing its subcontracting plan in good faith.

### C.2.3 WCH's Second Multimillion Dollar Subcontract Award to SAGE TEC Falsely Claiming Small Business Credit.

6.62    In or about August of 2012, after its false claims regarding Phoenix and after its false claims regarding SAGE TEC and the 100 Area Subcontract, WCH began the process of awarding another multi-million dollar subcontract on a restricted basis supposedly to disadvantaged small businesses, including WOSBs.

6.63    WCH ultimately awarded this second multimillion dollar subcontract to SAGE TEC once again teaming with FE&C.  WCH made this award despite knowing from past experience, as well as its technical and commercial evaluations for this second subcontract award, that SAGE TEC had no relevant experience, had no employees of its own other than its owner LAURA SHIKASHIO, had little or no

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 24

equipment, was far too small of an operation to perform even 15% of the work with its own organization as required by the second subcontract, and had previously acted as a pass through company on the 100 Area Subcontract merely providing its WOSB name and status with FE&C actually performing the work.

WCH's 300 Area Request for Proposal (RFP) No. R025228A00.

6.64   RFP No. R025228A00 (herein "the 300 Area RFP") was a request for proposal by WCH to award an expected 15 month subcontract, for work on the RCC Contract, to begin in November of 2012 with a scope of work that included the safe removal of the radiological and chemical contaminated waste sites, pipelines, tank farms, and below grade structures, associated with the 309 Building Plutonium Recycle Test Reactor (PRTR), and other waste sites including pipelines located at the Hanford Site's 300 area.

6.65   The scope of work of the subcontract contemplated in the 300 Area RFP required specialty construction services to perform the following: integrated work control and work management, engineering, procurement, fabrication and testing, structural stabilization, size reduction, building demolition, shielding, waste packaging, waste transportation, waste site remediation (excavation and loading), waste treatment, grout injection (with standard and sulfur based grouts), macroencapsulation (with standard and sulfur based grouts), solidification of liquids, and packaging waste for final disposal at the Hanford Environmental Restoration Disposal Facility (ERDF).

6.66   The 300 Area RFP was a set aside that was only made available by WCH to disadvantaged small businesses, including WOSBs.  WCH made this request for proposal available to eight (8) of nine (9) businesses that WCH had prequalified. Those eight (8) prequalified teams included, among six others, SAGE TEC (teaming with FE&C) and Phoenix.

6.67    On September 20, 2012, WCH received proposals from two (2) pre-qualified disadvantaged small businesses, SAGE TEC and Integrated Risk Reduction LLC (herein "IRR").

WCH's Technical Evaluation of SAGE TEC and FE&C on the 300 Area RFP

6.68    WCH conducted a technical evaluation of both SAGE TEC's and IRR's proposals.  WCH's Technical Evaluation Team consisted of subject matter-experts from: WCH Project Management; WCH Engineering; WCH Design Engineering, WCH Quality Assurance, WCH Radiological Engineering, and WCH Health and Safety.

6.69    WCH assembled its Technical Evaluation Team to evaluate the proposals for technical compliance for the proposed subcontract. WCH's Technical Evaluation Team identified various questions and clarifications needed during their review, to which both SAGE TEC and IRR responded.

6.70    The WCH Technical Evaluation Team ultimately determined that both IRR and SAGE TEC were technically acceptable to the terms of the 300 Area RFP.

6.71    During the request for proposal period WCH transmitted Clarification No. 1 to SAGE TEC asking for technical clarifications for team identification, personnel qualifications, organization, quality assurance, and various technical data and project approach.  SAGE TEC provided a response to Clarification No. 1.

6.72    During the request for proposal period WCH transmitted Clarification No. 2 to SAGE TEC asking for technical clarification on "Integrated Work Control Procedure, Work Packages, Key Individual commitment letters, and organization." SAGE TEC provided a response to Clarification No. 2.

6.73    Based in part on SAGE TEC's responses to Clarifications No. 1 and No. 2,  as well as SAGE TEC's Technical Proposal of September 20, 2012 (herein "SAGE TEC's 300 Area Technical Proposal"), WCH knew that SAGE TEC was again teaming with FE&C with SAGE TEC's supposed role being "Project Management" and "Engineering" and FE&C's role being "Field Operations, Schedule/Cost,

1    Deomolltion [sic], Remediation, Excavation, Loadout, Decon, Dust Control, Waste

2    Handling, ALARA, QA/QC, Labor for grouting."

3        6.74   Despite asking for individual commitment letters as part of Clarification

4    No. 2, on its technical evaluation WCH did not list asking for nor receiving a

5    commitment letter from LAURA SHIKASHIO, SAGE TEC's president, owner,

6    operator, and then sole employee.

7        6.75   Despite SAGE TEC's supposed role as "Project Management," in its

8    teaming arrangement with FE&C, SAGE TEC listed Ken Burgard as project manager.

9    Mr. Burgard, as the DEFENDANTS all knew, was then a project manager for FE&C

10   and had been employed by FE&C since 2005.  WCH requested and received a

11   commitment letter from Mr. Burgard.

12       6.76   Despite SAGE TEC's supposed role as "Project Management" in its

13   teaming arrangement with FE&C, SAGE TEC also listed, at different times, Shane

14   Bigham as its Project Manager and at times as its Deputy Project Manager in its

15   proposal materials to WCH.  Mr. Bigham, as the DEFENDANTS all knew, was then a

16   project manager for FE&C and had been employed by FE&C since 2009.

17       6.77   Despite SAGE TEC's supposed role as "Engineering" in its teaming

18   arrangement with FE&C, it listed Andrew Powers as its Project Engineer in its

19   proposal materials to WCH.  Mr. Powers, as the DEFENDANTS all knew, was then a

20   project engineer and assistant project manager for FE&C and had been employed by

21   FE&C since 2008.

22       6.78   Despite SAGE TEC's supposed role as "Engineering" in its teaming

23   arrangement with FE&C, its president, owner, operator, and at that time sole

24   employee, LAURA SHIKASHIO, as the DEFENDANTS all knew, was not an

25   engineer and, while having worked on the Hanford Site, her formal education

26   consisted of a general social sciences degree.

27       6.79   SAGE TEC's 300 Area Technical Proposal detailed for WCH that SAGE

28   TEC's relevant experience primarily consisted of the 100 Area Subcontract on which,

as the DEFENDANTS all knew,  SAGE TEC had acted as a pass through company merely providing its WOSB name and status with FE&C actually performing the work.  SAGE TEC also provided its experience with much smaller contracts and subcontracts including a $50,000 civil survey subcontract and an approximate $150,000 contract with WCH for a diesel and gasoline fuel facility design.

6.80   The actually relevant experience detailed in SAGE TEC's 300 Area Technical Proposal was not SAGE TEC's but FE&C's.  Specifically, FE&C's significant prior work at the Hanford Site on multiple multi-million dollar subcontracts for multiple prime contractors.  FE&C's relevant Hanford work, as highlighted by SAGE TEC in its 300 Area Technical Proposal included excavation activities in elevated radiation contaminated and airborne radiological areas and stated specifically:

> For WCH, FE&C performed this work at 100B/C burial grounds and 100 F burial grounds which had dose rates in excess of 70R.  At 100 K East, FE&C continues to perform this work for removal of basin residual contamination on the north side of the reactor.  Loadout activities routinely encompass contamination levels in excess of 6R."

6.81   Based on, among other things, its technical evaluation of SAGE TEC for the 300 Area RFP, WCH knew that SAGE TEC would again be acting as a pass through company merely providing its WOSB name and status with FE&C actually performing the work.

6.82   Despite WCH's knowledge of SAGE TEC's technical inability to perform the work on the subcontract with its own organization and its knowledge that SAGE TEC would once again be acting merely as a pass through company for FE&C, WCH's Technical Evaluation Team determined that SAGE TEC, with its teaming partner FE&C, was technically acceptable to the terms of the 300 Area RFP.

WCH's Commercial Evaluation of SAGE TEC and FE&C on the 300 Area RFP.

6.83   WCH also engaged in a commercial evaluation of the SAGE TEC and IRR proposals provided under the 300 Area RFP.  This was a price evaluation by WCH, which, among other things, evaluated the price of each of the two offers against each other and against the WCH Fair Cost Estimate.  WCH's price evaluation incorporated technical data as necessary to determine price difference rationale.

6.84 In SAGE TEC's Commercial Proposal dated September 20, 2012 (herein "SAGE TEC's 300 Area Commercial Proposal") it authorized LAURA SHIKASHIO and DeVerne Dunnum, a FE&C Senior Vice President, to negotiate on behalf of SAGE TEC with WCH on the 300 Area RFP.

6.85   SAGE TEC's 300 Area Commercial Proposal advised WCH, through financial statements for 2011, that SAGE TEC had total assets of approximately $2.2 million while FE&C had total assets of  approximately $13 million; that it had a net income of $378,922 while FE&C had net income of in excess of $2.5 million; and that it had cash on hand, as of September 30, 2011, of $342,462 while FE&C had cash on hand, as of December 31, 2011, of  in excess of $1.8 million.

6.86   SAGE TEC's 300 Area Commercial Proposal also included a Schedule of General and Administrative Expenses for the year ending December 31, 2011.  SAGE TEC's submitted schedule showed no expenses for salaries and wages or for any payroll expenses for all of 2011.

6.87   SAGE TEC's 300 Area Commercial Proposal did show that from January of 2012, through August of 2012 it spent $1,200 on salaries and wages, $144 on payroll expenses and that the total of all of its expenses for that time period was $26,987.68.

6.88   SAGE TEC's 300 Area Commercial Proposal, containing FE&C's financial statements, further showed WCH, in contrast to SAGE TEC, that in calendar year 2011 FE&C spent in excess of $2.3 million on salaries and wages, $919,848 on payroll taxes and benefits, and had total general and administrative expenses in excess of $6 million.

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 29

6.89   SAGE TEC's 300 Area Commercial Proposal also showed that SAGE TEC only had "Fixed Assets Vehicles" of $11,891.74 as of August 31, 2012, while FE&C had "Property, Plant, and Equipment and vehicles" worth in excess of $10 million as of December 31, 2011.

6.90   In fact, as the DEFENDANTS all knew, SAGE TEC had no equipment to contribute to the work on the sought after subcontract and ultimately did not contribute any equipment.

6.91   SAGE TEC's 300 Area Commercial Proposal also listed SAGE TEC's proposed subcontractors if it were to win the bid. SAGE TEC listed FE&C as doing "[W]aste site remediation, construction, loadout, excavation, tapping, pipelines, demolition" in a lump sum, fixed unit rate subcontract with a value of $15.2 million or approximately 84% of SAGE TEC's then proposed total billings to WCH. SAGE TEC then listed three other named subcontractors with a combine subcontract value of over $2.5 million making up over 14% of SAGE TEC's then proposed total billings to WCH.

6.92   As part of Clarification No. 1, WCH provided the following to SAGE TEC:

> Sage Tec does not appear to meet the requirement that that the lead Offeror shall perform with its own organization, work equivalent to at least fifteen percent (15%) of the total amount of work to be performed under this Subcontract. Please provide an explanation of how this will be accomplished based on the Form C-Subcontractor and Vendor List.

SAGE TEC's response to WCH, by LAURA SHIKASHIO, provided on October 2, 2012, was as follows:

> Response: Sage Tec LLC., as the lead Offeror on this RFP, shall be responsible for performing approximately 26.8% of the total amount of the Base Work with its own organization. Listed below are the major Base Work task areas for which Sage Tec will perform in part or in whole:
> - Mobilization Submittals

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 30

- Mobilization/Set Up
- Demobilization
- Key Personnel
- Design
- Civil Surveying
- Engineering
- Insurance
- Bonding

6.93   In determining the percentage of work that SAGE TEC would supposedly complete SAGE TEC and LAURA SHIKASHIO relied on FE&C, specifically the cost estimating services of Jim Mortimer, a Vice President for FE&C.

6.94   Notwithstanding SAGE TEC's assertion that it would perform 26.8% of "the Base Work" with its own organization, as a result of SAGE TEC's 300 Area Commercial Proposal and WCH's commercial evaluation thereof, WCH knew that SAGE TEC was in fact proposing to subcontract out over 98% of the work to be billed to WCH on the sought after subcontract, thereby once again acting primarily as a pass through company lending merely its WOSB name and status.

6.95   As part of SAGE TEC's 300 Area Commercial Proposal, LAURA SHIKASHIO provided a signed Representations and Certifications to WCH on behalf of SAGE TEC falsely claiming, as the DEFENDANTS all knew, that SAGE TEC was a WOSB and would be so acting if awarded the sought after subcontract, when in fact SAGE TEC, as the DEFENDANTS all knew, would be acting merely as a pass through company for FE&C, performing less than 15% of the work, with FE&C actually performing the work.

6.96   On October 22, 2012, WCH received the best and final offers from SAGE TEC and IRR on the 300 Area RFP.  SAGE TEC's best and final offer was over $6 million lower than IRR's best and final offer, beating IRR's best and final offer by nearly 30%.

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 31

6.97   SAGE TEC's best and final offer was also more than 20% below WCH's initial fair cost estimate.  Accordingly, WCH adjusted its fair cost estimate down by over $2 million, accounting for SAGE TEC's lower estimate of labor hours and a 20% reduction in WCH's assumed rental rates based on WCH's conclusion that "[s]ince most of the equipment required to perform the Work is owned by Offerror's Team the rental rate could be reduced to 60% of Blue Book rates."

<u>WCH's Award of the Second Multi-Million Dollar Subcontract to SAGE TEC</u>

6.98   Despite knowing that SAGE TEC was again proposing to lend merely its WOSB name and status to the subcontract, WCH falsely represented to DOE that SAGE TEC was the technically acceptable, responsive, responsible offeror with the lowest evaluated price, including that SAGE TEC met all of the requirements of the solicitation including the requirement that it perform 15% of the work with its own organization.

6.99   On or about October 31, 2012, WCH entered into Subcontract No. C025228A00 (herein "the 300 Area Subcontract") with SAGE TEC.  The 300 Area Subcontract was in an amount of $15,071,251.00 with additional optional work scope in the amount of $868,237.00 for a total value of $15,939,488.00.   The 300 Area Subcontract was a fixed price subcontract.

<u>SAGE TEC Did Not Perform 15% of the Work on the 300 Area Subcontract</u>
<u>with its Own Organization and was Acting as a Pass Through Company for</u>
<u>FE&C.</u>

6.100 Consistent with SBA regulations, specifically 13 C.F.R. § 125.6, the 300 Area Subcontract explicitly required SAGE TEC, as a WOSB, to "perform with its own organization, work equivalent to at least fifteen percent (15%) of the total amount of work to be performed under this subcontract."  The DEFENDANTS were aware of this requirement.

6.101 Despite this obligation SAGE TEC, as the DEFENDANTS all knew, did not perform 15% of the work on the 300 Area Subcontract with its own organization.

Instead, SAGE TEC, as the DEFENDANTS all knew, used FE&C's employees to perform SAGE TEC's supposed portion of the work, once again acting as a pass through company merely providing its WOSB name and status with FE&C actually performing the work.

6.102 In using employees from FE&C, SAGE TEC merely paid invoices from FE&C for the charge out rate of those employees.  FE&C continued to pay the full wages and benefits of any of their employees used by SAGE TEC.

6.103 On August 6, 2013, after being notified of the UNITED STATES' authorization to partial intervene in this cause and file the instant allegations regarding SAGE TEC and the 300 Area Subcontract, WCH notified SAGE TEC that it was terminating the 300 Area Subcontract with SAGE TEC effective August 8, 2013. WCH provided that this was a Termination for Convenience as provided for under the terms of the 300 Area Subcontract.

<u>As a Result of SAGE TEC not Performing even 15% of the Work with its Own Organization and Acting as a Pass Through Company for FE&C, the DEFENDANTS Submitted or Caused to be Submitted False Claims and Used, Made, or Caused to be Used or Made False Records or Statements.</u>

6.104 The DEFENDANTS' specific false claims and false records or statements related to the 300 Area Subcontract are identified *infra* in Section VII of this Complaint.

6.105 The DEFENDANTS all knew that SAGE TEC was once again acting as a pass through company merely providing its WOSB name and status with FE&C actually performing the work and SAGE TEC not even performing 15% with its own organization.  The DEFENDANTS nonetheless repeatedly falsely and/or fraudulently represented to DOE that SAGE TEC was an eligible WOSB with respect to the 300 Area Subcontract and that, *inter alia*, WCH was entitled to WOSB credit and was implementing its subcontracting plan in good faith.

//

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 33

## VII.   FALSE CLAIMS, RECORDS, AND STATEMENTS IDENTIFIED

7.1    The UNITED STATES re-alleges and incorporates by reference paragraphs 1.1 through 6.105 of this Complaint.

### A. WCH's Truck & Pup Subcontract Modifications for which WCH and FE&C Falsely Claimed Phoenix as a Small Business.

7.2    The amounts and relevant dates for which WCH and FE&C falsely claimed that Phoenix was a small business to DOE under the RCC Contract in multiple modifications are set forth in the table below, each one constituting a false claim under the False Claims Act:

| RFP No. | Line Description | Amount | P/O Line Date |
|---------|------------------|--------|---------------|
| S009166A00 | Modification No. 2-CN's 5-11 | 67,072.00 | 2/3/10 |
| S009166A00 | Modification No. 3-CN 12 Option 1 | 520,897.00 | 2/3/10 |
| S009166A00 | Funding added for CN 04 Contractor directed OT | 100,000.00 | 2/24/10 |
| S009166A00 | Modification No. 4-CN's 13-18 | 1,880,985.00 | 3/10/10 |
| S009166A00 | Add Funding for Contract Closeout | 205,308.10 | 7/6/10 |
| S009166A00 | Add Funding for Bonding Costs | 5,319.00 | 11/1/10 |
| | | | |
| | | Total: $2,779,581.10 | |

7.3    These false claims were submitted or caused to be submitted to DOE by WCH and FE&C.

7.4    In addition, WCH and FE&C made, used, or caused to be made or used each and every one the modifications, each and every one of which also constituted a false record or statement material to a false or fraudulent claim under the False Claims Act.  The false or fraudulent claims that the modifications were material to included, but were not limited to, WCH's monthly invoices to DOE under the RCC Contract, listed *infra* at paragraph 7.33, from and including February of 2010 through at least November of 2010, and all of WCH's Quarterly Fee Invoices listed *infra* at paragraph 7.37, from and including February 2010 through at least November of 2010.

7.5    As a result of these modifications the UNITED STATES, through DOE, paid money under the RCC Contract that it otherwise would not have.

**B. Sage Tec's False and/or Fraudulent Technical and Commercial Proposals under the 100 Area and 300 Area RFPs.**

7.6    SAGE TEC's 100 Area Technical Proposal dated July 19, 2010, its 100 Area Commercial Proposal dated July 19, 2010, its 300 Area Technical Proposal dated September 20, 2012, and its 300 Area Commercial Proposal dated September 20, 2012, (herein collectively "SAGE TEC's proposals" where appropriate) each constitute false and/or fraudulent records or statements material to a false or fraudulent claim under the False Claims Act.

7.7    SAGE TEC's proposals contained false and/or fraudulent representations that SAGE TEC was properly classified as a WOSB in performing on the proposed subcontract and would not be acting as a pass through company merely providing its WOSB name and status with FE&C actually performing the work.  Those false and fraudulent representations were known to the DEFENDANTS.

7.8    The DEFENDANTS each knowingly made, used, or caused to be made or used each of SAGE TEC's proposals.  The false or fraudulent claims that SAGE TECH's proposals were material to included, but were not limited to, all of WCH's monthly invoices to DOE under the RCC Contract, listed *infra* at paragraph 7.33, from and including November 2010 forward, and all of WCH's Quarterly Fee Invoices listed *infra* at paragraph 7.37, from and including November 2010 forward.

7.9    As a result of SAGE TEC's proposals the UNITED STATES, through DOE, paid money under the RCC Contract that it otherwise would not have

**C. WCH's False Claim and False Record or Statement to DOE Regarding the 300 Area Subcontract Award to SAGE TEC.**

7.10    WCH submitted a "Request for Consent to Award" to DOE in order to obtain DOE's consent and approval for the proposed 300 Area Subcontract award to SAGE TEC.  Specifically, a Request for Consent to Award dated November 6, 2012,

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 35

with referenced attachments, from WCH's Deputy Manager of Contracts and Procurement to a DOE contracting officer assigned to the RCC Contract, (herein "WCH's Request for Consent").

7.11    WCH's Request for Consent contained knowing falsities, specifically, false and fraudulent representations that SAGE TEC was properly classified as a WOSB in performing on the proposed subcontract and would not be acting as a pass through company merely providing its WOSB name and status with FE&C actually performing the work.  Those false and fraudulent representations were known to the DEFENDANTS and WCH's Request for Consent was caused to be submitted to DOE by all the DEFENDANTS.

7.12    WCH's Request for Consent constituted a false claim under the False Claims Act.

7.13    WCH's Request for Consent also constituted a false record or statement material to a false or fraudulent claim under the False Claims Act.  The false or fraudulent claims that WCH's Request for Consent was material to included, but was not limited to, all of WCH's monthly invoices to DOE under the RCC Contract, listed *infra* at paragraph 7.33 from and including November 2012 forward, and all of WCH's Quarterly Fee Invoices listed *infra* at paragraph 7.37, from and including November 2010 forward.

7.14    As a result of WCH's Request for Consent the UNITED STATES, through DOE, paid money under the RCC Contract that it otherwise would not have.

**D. SAGE TEC's False Invoices to WCH.**

7.15    Pursuant to Section 3.3.5 of Exhibit B, Special Conditions, of the 100 Area Subcontract, SAGE TEC submitted monthly invoices to WCH in order to receive payment for work completed during the entirety of the 100 Area Subcontract (herein "100 Area monthly invoices").

7.16 Pursuant to Section 3.3.15 of Exhibit B, Special Conditions, of the 100 Area Subcontract, SAGE TEC also submitted  final invoices to WCH to receive

payment for work completed under the 100 Area Subcontract (herein "100 Area final invoices").

7.17   In addition, pursuant to Section 3.3.5 of Exhibit B, Special Conditions, of the 300 Area Subcontract, SAGE TEC submitted monthly invoices to WCH in order to receive payment for work completed during the entirety of the 300 Area Subcontract (herein "300 Area monthly invoices").

7.18 Pursuant to Section 3.3.14 of Exhibit B, Special Conditions, of the 300 Area Subcontract, SAGE TEC also submitted  final invoices to WCH to receive payment for work completed under the 300 Area Subcontract (herein "100 Area final invoices").

7.19   Through the 100 Area invoices, the 100 Area final invoices, the 300 Area invoices, and the 300 Area final invoices (herein collectively "SAGE TEC's invoices" where appropriate) SAGE TEC made claims for payment to WCH, a DOE prime contractor, that were ultimately paid or reimbursed by DOE to WCH which spent or had spent the money to advance a program or interest of the UNITED STATES. Accordingly, each and every one of the SAGE TEC invoices were claims as defined under the False Claims Act.

7.20   All of SAGE TEC's invoices contained false and/or fraudulent representations that SAGE TEC was not acting as a pass through company merely providing its WOSB name and status with FE&C actually performing the work.  In fact, as the DEFENDANTS all knew, SAGE TEC was acting as a pass through company on each of the subcontracts merely providing its WOSB name and status with FE&C actually performing the work.  Accordingly, each and every one of SAGE TEC's invoices was a false claim under the False Claims Act.

7.21   Each and every one of SAGE TEC's invoices were submitted or caused to be submitted to WCH by each of the DEFENDANTS and knowingly passed on to DOE by WCH in its monthly invoices.

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 37

7.22   The DEFENDANTS made, used, or caused to be made or used each and every one of SAGE TEC's invoices, each and every one of which also constituted a false record or statement material to a false or fraudulent claim under the False Claims Act.  The false or fraudulent claims that SAGE TEC's invoices were material to included, but were not limited to, all of WCH's monthly invoices to DOE under the RCC Contract, listed *infra* at paragraph 7.33, from and including November 2010 forward, and all of WCH's Quarterly Fee Invoices listed *infra* at paragraph 7.37, from and including November 2010 forward.

7.23 As a result of the SAGE TEC invoices the UNITED STATES, through DOE, paid money under the RCC Contract that it otherwise would not have.

**E.  WCH's False Semi-Annual Small Business Subcontract Reports to DOE.**

7.24   Under the RCC Contract WCH provided DOE with semi-annual small business subcontract reports every six months to advise DOE as to WCH's progress in meeting the goals established in its small business subcontracting plan.  DOE would review, among other things, these semi-annual small business subcontract reports in making its evaluation of WCH's performance in meeting its small business subcontracting goals and to determine if any fee reduction was appropriate pursuant to clause H.28 "Small Business Subcontracting Fee Reduction," of the RCC Contract.

7.25 WCH submitted the following semi-annual small business subcontract reports to DOE, each one entitled "Subcontracting Report for Individual Contracts," each one reporting from the date of the inception of the RCC Contract to a date specific, and each one a false and/or fraudulent record or statement material to a false or fraudulent claim under the False Claims Act and identified as follows:

| Reporting Period Ending: | Date Signed: |
| --- | --- |
| March 31, 2009 | April 30, 2009 |
| September 30, 2009 | October 21, 2009 |

| | |
|---|---|
| March 31, 2010 | April 21, 2010 |
| September 30, 2010 | October 28, 2010 |
| March 31, 2011 | April 28, 2011 |
| September 30, 2011 | October 1, 2011 |
| March 31, 2012 | April 9, 2012 |
| September 30, 2012 | October 31, 2012 |
| March 31, 2013 | April 9, 2013 |
| September 30, 2013 | October 22, 2013 |

7.26    These semi-annual small business subcontract reports falsely and/or fraudulently represented that WCH was implementing its subcontracting plan in good faith as required by the RCC Contract, when, as the DEFENDANTS all knew, WCH was not implementing its subcontracting plan in good faith based on WCH's knowingly misrepresenting the small business status of Phoenix on the Truck & Pup Subcontract to DOE and its knowingly misrepresenting the WOSB status of SAGE TEC as well as SAGE TEC's performance on the 100 Area and 300 Area Subcontracts to DOE.

7.27    The DEFENDANTS knowingly made, used, or caused to be made or used each of these false and/or fraudulent semi-annual small business subcontract reports.  The false or fraudulent claims that WCH's semi-annual small business subcontract reports were material to included, but were not limited to, all of WCH's monthly invoices to DOE under the RCC Contract, listed *infra* at paragraph 7.33 , and all of WCH's Quarterly Fee Invoices listed *infra* at paragraph 7.37.

7.28    As a result of WCH's semi-annual small business subcontract reports the UNITED STATES, through DOE, paid money under the RCC Contract that it otherwise would not have.

**F.  WCH's False Claims to DOE on WCH's Balanced Scorecard Reports.**

7.29    Under the RCC Contract WCH provided DOE with Balanced Scorecards

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 39

for each fiscal year.  The WCH Balanced Scorecards advised DOE, among other things, of WCH's progress in meeting the goals established in its small business subcontracting plan.  DOE would review, among other things, the WCH Balanced Scorecards in making its evaluation of WCH's performance in meeting its small business subcontracting goals and to determine if any fee reduction was appropriate pursuant to clause H.28 "Small Business Subcontracting Fee Reduction," of the RCC Contract.

7.30    WCH submitted Balanced Scorecards to DOE under the RCC Contract for fiscal years 2009, 2010, 2011, 2012, and 2013 each one falsely and/or fraudulently representing that WCH was implementing its subcontracting plan in good faith as required by the RCC Contract, when, as the DEFENDANTS all knew, WCH was not implementing its subcontracting plan in good faith based on WCH's knowingly misrepresenting the small business status of Phoenix on the Truck & Pup Subcontract to DOE and its knowingly misrepresenting the WOSB status of SAGE TEC as well as SAGE TEC's performance on the 100 Area and 300 Area Subcontracts to DOE.

7.31    The DEFENDANTS knowingly made, used, or caused to be made or used each of these false and/or fraudulent Balanced Scorecards each one constituting a false and/or fraudulent record or statement material to a false and/or fraudulent claim under the False Claims Act.  The false and/or fraudulent claims that WCH's Balanced Score Cards were material to included, but were not limited to, all of WCH's monthly invoices to DOE under the RCC Contract, listed *infra* at paragraph 7.33, and all of WCH's Quarterly Fee Invoices listed *infra* at paragraph 7.37.

7.32    As a result of WCH's Balanced Scorecards the UNITED STATES, through DOE, paid money under the RCC Contract that it otherwise would not have.

**G. False Claims from WCH to DOE in Monthly Invoices.**

7.33    Between January 26, 2010 and September 30, 2013, the DEFENDANTS knowingly submitted and caused to be submitted false claims by WCH to DOE in the

form of the below monthly invoices and associated drawdowns against the DOE line of credit:

| Date of Invoice | Period of Performance | Month of Invoice | Invoice Number | Invoiced Amount |
|---|---|---|---|---|
| 1/26/10 | 12/27/09 - 1/24/10 | January-10 | 100401WC | $ 18,814,935.81 |
| 2/24/10 | 1/25/10 - 2/21/10 | February-10 | 100501WC | $ 21,759,631.06 |
| 3/31/10 | 2/22/10 - 3/28/10 | March-10 | 100601WC | $ 31,519,488.55 |
| 4/28/10 | 3/29/10 - 4/25/10 | April-10 | 100701WC | $ 24,855,330.78 |
| 5/27/10 | 4/26/10 - 5/23/10 | May-10 | 100801WC | $ 27,114,000.03 |
| 6/30/10 | 5/24/10 - 6/27/10 | June-10 | 100901WC | $ 34,661,513.54 |
| 8/3/10 | 6/28/10 - 7/25/10 | July-10 | 101001WC | $ 46,400,871.12 |
| 8/30/10 | 7/26/10 - 8/29/10 | August-10 | 101101WC | $ 35,096,475.47 |
| 10/4/10 | 8/30/10 - 9/30/10 | September-10 | 101201WC | $ 41,543,875.31 |
| 11/1/10 | 10/1/10 - 10/24/10 | October-10 | 110101WC | $ 22,685,121.47 |
| 11/29/10 | 10/25/10 - 11/21/10 | November-10 | 110201WC | $ 31,044,302.76 |
| 12/27/10 | 11/22/10 - 12/19/10 | December-10 | 110301WC | $ 27,066,609.31 |
| 5/16/11 | 12/20/10 - 1/23/11 | January-11 | 110401WC | $ 29,695,982.88 |
| 5/16/11 | 1/24/11 - 2/20/11 | February-11 | 110501WC | $ 31,596,934.79 |
| 5/16/11 | 2/21/11 - 3/20/11 | March-11 | 110601WC | $ 31,193,442.74 |
| 5/16/11 | 3/21/11 - 4/17/11 | April-11 | 110701WC | $ 29,379,867.55 |
| 5/25/11 | 4/18/11 - 5/22/11 | May-11 | 110801WC | $ 37,210,663.26 |
| 7/6/11 | 5/23/11 - 6/19/11 | June-11 | 110901WC | $ 30,308,210.71 |
| 8/3/11 | 6/20/11 - 7/24/11 | July-11 | 111001WC | $ 31,945,006.57 |
| 8/25/11 | 7/25/11 - 8/21/11 | August-11 | 111101WC | $ 29,405,121.78 |
| 10/4/11 | 8/22/11 - 9/30/11 | September-11 | 111201WC | $ 44,489,985.13 |
| 10/26/11 | 10/1/11 - 10/23/11 | October-11 | 120101WC | $ 25,223,177.68 |
| 11/28/11 | 10/24/11 - 11/20/11 | November-11 | 120201WC | $ 25,928,338.67 |
| 12/21/11 | 11/21/11 - 12/18/11 | December-11 | 120301WC | $ 27,125,619.78 |
| 1/25/12 | 12/19/11 - 1/22/12 | January-12 | 120401WC | $ 29,532,650.63 |
| 2/23/12 | 1/23/12 - 2/19/12 | February-12 | 120501WC | $ 25,915,524.05 |
| 3/22/12 | 2/20/12 - 3/18/12 | March-12 | 120601WC | $ 30,539,858.07 |
| 5/2/12 | 3/19/12 - 4/22/12 | April-12 | 120701WC | $ 34,428,234.08 |
| 5/23/12 | 4/23/12 - 5/20/12 | May-12 | 120801WC | $ 24,354,352.16 |
| 6/19/12 | 5/21/12 - 6/17/12 | June-12 | 120901WC | $ 25,159,135.06 |
| 7/25/12 | 6/18/12 - 7/22/12 | July-12 | 121001WC | $ 25,082,459.25 |
| 8/22/12 | 7/23/12 - 8/19/12 | August-12 | 121101WC | $ 18,337,677.43 |
| 10/2/12 | 8/20/12 - 9/30/12 | September-12 | 121201WC | $ 35,242,697.05 |
| 11/5/12 | 10/1/12 - 10/28/12 | October-12 | 130101WC | $ 20,081,286.96 |
| 11/27/12 | 10/29/12 - 11/25/12 | November-12 | 130201WC | $ 23,430,980.37 |
| 12/27/12 | 11/26/12 - 12/23/12 | December-12 | 130301WC | $ 21,559,585.07 |
| 1/30/13 | 12/24/12 - 1/27/13 | January-13 | 130401WC | $ 23,538,152.88 |
| 2/27/13 | 1/28/13 - 2/24/13 | February-13 | 130501WC | $ 21,104,024.52 |
| 3/26/13 | 2/25/13 - 3/24/13 | March-13 | 130601WC | $ 22,912,974.18 |
| 4/30/13 | 3/25/13 - 4/28/13 | April-13 | 130701WC | $ 23,846,290.66 |
| 6/20/13 | 4/29/13 - 5/26/13 | May-13 | 130801WC | $ 20,893,242.43 |
| 6/25/13 | 5/27/13 - 6/23/13 | June-13 | 130901WC | $ 18,855,132.59 |
| 7/30/13 | 6/24/13 - 7/28/13 | July-13 | 131001WC | $ 23,594,192.37 |
| 8/27/13 | 7/29/13 - 8/25/13 | August-13 | 131101WC | $ 20,502,978.96 |
| 9/30/13 | 8/26/13 - 9/30/13 | September-13 | 131201WC | $ 31,831,021.00 |
| | | | | **TOTAL: $1,256,806,956.52** |
| | | | | |

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 41

7.34    These claims were knowingly false because they included amounts for the subcontracts to Phoenix and/or SAGE TEC, as the DEFENDANTS knowingly misrepresented the small business status of Phoenix and/or the WOSB status of SAGE TEC on those subcontracts, and because WCH was in material noncompliance with the terms and conditions of the RCC Contract by a) knowingly misrepresenting the small business status of Phoenix on the Truck & Pup Subcontract and/or the WOSB status of SAGE TEC and/or SAGE TEC's performance on the 100 Area and 300 Area Subcontracts; b) falsely claiming small business credit for SAGE TEC and/or Phoenix; and/or c) falsely claiming that it was complying in good faith with its small business subcontracting plan under the RCC Contract.

7.35    WCH knowingly submitted each and every one of its above listed monthly invoices to DOE.  In addition, those above listed WCH monthly invoices from and including November 2010 forward, were also caused to be submitted by FE&C, SAGE TEC, and LAURA SHIKASHIO.

7.36    As a result of WCH's monthly invoices the UNITED STATES, through DOE, paid money under the RCC Contract that it otherwise would not have.

**H. WCH False Claims for Incentive Fee.**

7.37    Under the RCC Contract WCH submitted quarterly invoices for Interim Fee Payments (herein "WCH Quarterly Fee Invoices").  Between January of 2010 and September of 2013, the DEFENDANTS knowingly submitted and caused to be submitted false claims by WCH to DOE in the form of the below referenced WCH Quarterly Fee Invoices and associated net interim fee payments paid to WCH:

| Calendar Quarter Ending | Net Interim Fee Paid |
|---|---|
| 3/31/2010 | $   2,611,941 |
| 6/30/2010 | $   2,321,288 |
| 9/23/2010 | $      600,000 |
| 9/30/2010 | $   3,709,486 |
| 12/31/2010 | $   1,747,045 |

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 42

| 3/31/2011 | $ | 2,452,592 |
|---|---|---|
| 6/30/2011 | $ | 3,377,667 |
| 9/30/2011 | $ | 6,233,647 |
| 12/31/2011 | $ | 3,646,842 |
| 3/31/2012 | $ | 1,942,682 |
| 6/30/2012 | $ | 2,444,658 |
| 9/30/2012 | $ | 1,389,507 |
| 12/31/2012 | $ | 3,962,755 |
| 3/31/2013 | $ | 3,499,138 |
| 6/30/2013 | $ | 2,689,476 |
| 9/30/2013 | $ | 1,814,581 |
| | **Total: $44,443,304** | |

7.38   The above referenced WCH Quarterly Fee Invoices were false claims under the False Claims Act submitted or caused to be submitted by the DEFENDANTS.  Each and every one of the above referenced WCH Quarterly Fee Invoices falsely and/or fraudulently claimed that WCH was in material compliance with the terms of the RCC Contract and entitled to interim fee payments when in fact, as the DEFENDANTS all knew, WCH was not in material compliance with the terms and conditions of the RCC Contract based on its knowing misrepresentations of the small business status of Phoenix; its knowing misrepresentations of the WOSB status of SAGE TEC and its performance on the 100 Area and 300 Area Subcontracts; its falsely claiming small business credit for SAGE TEC and Phoenix; and its falsely claiming that it was complying in good faith with its small business subcontracting plan under the RCC Contract.

7.39   As a result of the above referenced WCH Quarterly Fee Invoices the UNITED STATES, through DOE, paid money under the RCC Contract that it otherwise would not have.

**VIII.  CAUSES OF ACTION**

8.1   The UNITED STATES re-alleges and incorporates by reference paragraphs 1.1 through 7.39 of this Complaint.

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 43

## COUNT I
### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(A)

8.2     The DEFENDANTS violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(A), by knowingly presenting and causing to be presented to the United States Department of Energy false and/or fraudulent claims for payment on the RCC Contract, the Truck and Pup Subcontract, the 100 Area Subcontract, and the 300 Area Subcontract.

8.3     The UNITED STATES, through the United States Department of Energy, paid the false and/or fraudulent claims because of the DEFENDANTS' acts and incurred damages as a result.

8.4     Pursuant to 31 U.S.C. § 3729(a), the DEFENDATNS are liable to the UNITED STATES for a civil penalty of not less than $5,500 and not more than $11,000, for each violation of the False Claims Act committed by the DEFENDANTS or any one of them.

8.5     Pursuant to 31 U.S.C. § 3729(a), the DEFENDANTS are liable to the UNITED STATES for three times the amount of all damages sustained by the UNITED STATES because of the DEFENDANTS' conduct.

## COUNT II
### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)

8.6     The DEFENDANTS violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), by knowingly making, using, or causing to be made or used,

false records or statements material to false or fraudulent claims for payment to the United States Department of Energy, which claims the UNITED STATES, through the United States Department of Energy, did pay.

8.7    The UNITED STATES paid the false or fraudulent claims because of the DEFENDANTS' acts and incurred damages as a result.

8.8    Pursuant to 31 U.S.C. § 3729(a), the DEFENDANTS are liable to the UNITED STATES for a civil penalty of not less than $5,500 and not more than $11,000, for each violation of the False Claims Act committed by the DEFENDANTS or any one of them.

8.9    Pursuant to 31 U.S.C. § 3729(a), the DEFENDANTS are liable to the UNITED STATES for three times the amount of all damages sustained by the UNITED STATES because of the DEFENDANTS' conduct.

**COUNT III**
**For Breach of Contract**
**(Only Against Defendant WCH)**

8.10    Without excuse, WCH materially breached its contract with the United States Department of Energy (the RCC Contract) by: (1) failing to comply with the small business subcontracting plan; (2) failing to carry out the small business subcontracting plan in good faith; and (3) making false and/or fraudulent representations to DOE that Phoenix was acting as an eligible small business and that SAGE TEC was acting as an eligible WOSB.

8.11    WCH's breach of the RCC Contract caused damages to the United States

Department of Energy and WCH is liable to the UNITED STATES in the amount of the damages caused by its breach.

## COUNT IV
### For Unjust Enrichment

8.12   By receiving payments and profits from the UNITED STATES through the United States Department of Energy by making and using false records and statements, and through its wrongful, improper, and corrupt conduct, the DEFENDANTS have each been unjustly enriched and are liable to repay such amounts to the UNITED STATES.

## COUNT V
### For Payment By Mistake

8.13   As a result of their conduct, the DEFENDANTS each received payments from the UNITED STATES, through the United States Department of Energy, to which they were not entitled and as a result of mistake of fact of the UNITED STATES through the United States Department of Energy.

8.14   The UNITED STATES, through the United States Department of Energy, relied upon their mistake in authorizing and approving payment to FE&C through SAGE TEC and WCH; to SAGE TEC through WCH; to LAURA SHIKASHIO through SAGE TEC and WCH; and to WCH itself.

8.15   The DEFENDANTS are liable to the UNITED STATES for the amounts paid to them by the UNITED STATES, through the United States Department of Energy, by mistake.

# IX.    PRAYER FOR RELIEF

9.1    The UNITED STATES re-alleges and incorporates by reference

paragraphs 1.1 through 8.15 of this Complaint

9.2    WHEREFORE, Plaintiff UNITED STATES OF AMERICA prays for

Judgment against the DEFENDANTS, as follows:

A. As to Counts I and II under the False Claims Act, 31 U.S.C. § 3729(a),

against the DEFENDANTS, for treble the amount of the UNITED

STATES' single damages to be proven at trial, plus civil penalties as are

required by law in the amount of $5,500 to $11,000 per violation of the

False Claims Act, post-judgment interest, costs, and such other relief as

may be necessary and proper;

B. As to Count III, breach of contract, against WCH, for the amount of

damages sustained by the UNITED STATES as a result of  WCH's

breaches of contract, to be proven at trial, plus pre-judgment and post-

judgment interest, and costs;

C. As to Count IV, unjust enrichment, against the DEFENDANTS, for the

sums by which the DEFENDANTS have been unjustly enriched, which

will be proven at trial, plus pre-judgment and post-judgment interest,

and costs;

D. As to Count V, payment by mistake, against the DEFENDANTS, for the

amounts paid to the DEFENDANTS by mistake, which will be proven at

trial, and for pre-judgment and post-judgment interest, and costs; and

E.  Such other relief as the Court deems just and proper.

9.3     The UNITED STATES demands a trial by jury as to all issues so triable.


Dated: December 6, 2013.

MICHAEL C. ORMSBY
United States Attorney



s/ *Tyler H.L. Tornabene*
Tyler H.L. Tornabene
Assistant United States Attorney

1

**CERTIFICATE OF SERVICE**

2

I hereby certify that on December 6, 2013, I electronically filed the foregoing
3 with the Clerk of the Court using the CM/ECF system which will send notification of
such filing to the following:

4

5   Bruce Babbitt:                          bbabbitt@jbsl.com

6   David Groff:                            dgroff@groffmurphy.com

7
    Marisa Bavand:                          mbavand@groffmurphy.com
8

9   Meredith Thielbahr:                     mthielbahr@groffmurphy.com

10  Shelley Tolman:                         stolman@groffmurphy.com

11
    Brad Fisher:                            bradfisher@dwt.com
12

13  Mark Bartlett:                          markbartlett@dwt.com

14  John Stewart:                           jstewart@lawssg.com

15
    Tyler Storti:                           tstorti@lawssg.com
16

17  and to the following non CM/ECF participants:  N/A

18

19

20                                          s/ *Tyler H.L. Tornabene*
                                            Tyler H.L. Tornabene
21                                          Assistant United States Attorney

22

23

24

25

26

27

28

UNITED STATES' COMPLAINT IN PARTIAL INTERVENTION - 49