UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

UNITED STATES OF AMERICA, *ex rel.*,
SALINA SAVAGE, SAVAGE LOGISTICS,
LLC,

                    Plaintiffs,

          v.

WASHINGTON CLOSURE HANFORD LLC;
FEDERAL ENGINEERS AND
CONSTRUCTORS, INC.; PHOENIX
ENTERPRISES NW, LLC; DENNIS
HOUSTON; BERNIE LAVERENTZ; JONETTA
EVERANO; DOES I-V; PHOENIX-ABC
JOINT VENTURE; ACQUISITION
BUSINESS CONSULTANTS; JESSICA
MORALES; SAGE TEC LLC; and LAURA
SHIKASHIO,

                    Defendants.

No. CV-10-5051-EFS

**ORDER RULING ON PENDING DISMISSAL
MOTIONS AND OTHER MOTIONS, AND
AMENDING THE CASE CAPTION**

The old proverb, "It's not what you know but who you know," is at the heart of the assertions brought by the United States' and the Relators Salina Savage and her business Savage Logistics. The Plaintiffs allege that Defendants took their personal connections a step too far in order to gain a financial benefit, i.e., Defendants reached agreement amongst themselves to establish a façade of small, disadvantaged businesses that applied for, and were awarded small-business government contracts by the prime contractor while the work under the contracts was actually performed by a large business rather

ORDER - 1

than the small business. All involved businesses financially benefitted from this arrangement: the "façade" small business (PENW, Phoenix-ABC, and Sage Tec) was awarded the subcontract without performing the vast majority of the work; the larger subcontractor (FE&C) whom performed the work was able to perform paid work on a project that it otherwise would have been unable to be awarded; and the prime contractor (WCH) reported to the United States that it subcontracted a greater portion of its work to small, disadvantaged businesses then it truly did, thereby satisfying its small, disadvantaged business set-aside obligations under its contract with the United States and statutory and regulatory law.

One may ask what is the harm of encouraging small businesses to partner with larger businesses on complicated government projects? The United States and the Relators assert that harm arises when the true nature and purpose of the business arrangement is undisclosed, thereby causing the awarded contract and related invoicing to be based on false misrepresentations to the United States. Further, here, the façade business arrangements violate the letter and spirit of the Small Business Act:

> The essence of the American economic system of private enterprise is free competition. Only through full and free competition can free markets, free entry into business, and opportunities for the express and growth of personal initiative and individual judgment be assured. The preservation and expansion of such competition is basic not only to the economic well-being but to the security of this Nation. Such security and well-being cannot be realized unless the actual and potential capacity of small business is encouraged and developed. It is the declared policy of the Congress that the Government should aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns in order to preserve free

competitive enterprise, to insure that a fair proportion of the total purchases and contracts or subcontracts for property and services for the Government (including but not limited to contracts or subcontracts for maintenance, repair, and construction) be placed with small-business enterprises, to insure that a fair proportion of the total sales of Government property be made to such enterprises, and to maintain and strengthen the overall economy of the Nation.

15 U.S.C. § 631.  In this lawsuit, the Relators and the United States allege that Defendants not only contravened the Small Business Act but in so doing made false and fraudulent misrepresentations that caused financial harm to the United States, thereby violating the False Claims Act, 31 U.S.C. §§ 3729-3733.

A hearing occurred in the above-captioned matter on August 14, 2014.[1]  Before the Court were several motions: 1) Defendants Washington Closure Hanford (WCH) and Dennis Houston's (collectively, "WCH Defendants") Motion to Dismiss Relator's Third Amended Complaint, ECF No. 183; 2) Defendants Phoenix Enterprises Northwest (PENW), Phoenix-ABC A Joint Venture ("Phoenix-ABC"), and Jonetta Everano's (collectively, "PENW Defendants") Motion to Dismiss Plaintiffs' Third Amended Complaint, ECF No. 185; 3) WCH Defendants' Motion to Dismiss the United States' Complaint in Intervention, ECF No. 194; 4) Defendant Federal Engineers & Constructors, Inc. (FE&C) and Bernie

---

[1] Tyler Tornabene and Vanessa Waldref appeared on behalf of the United States of America, while Bruce Babbitt appeared on behalf of Relator Salina Savage, who was present, and Relator Savage Logistics. Attorneys present for Defendants were Marisa Bavand (Washington Closure Hanford and Dennis Houston), Mark Bartlett (Federal Engineers and Constructors and Bernie Laverentz), Tyler Storti (Phoenix Enterprises Northwest, Phoenix-ABC A Joint Venture, and Jonetta Everano), Shea Meehan (Acquisition Business Consultants and Jessica Morales), and Bradford Axel (Sage Tec and Laura Shikashio).

Laverentz's (collectively, "FE&C Defendants") Motion to Dismiss Relators Third Amended Complaint, ECF No. 195; 5) FE&C Defendants' Motion to Dismiss the United States's Truck and Pup Subcontract Claims, ECF No. 196; 6) Defendants' Acquisition Business Consultants, Inc. (ABC) and Jessica Morales' (collectively, "ABC Defendants") Motion to Dismiss Plaintiffs' Third Amended Complaint, ECF No. 198; and 7) WCH Defendants' Motion to Bifurcate Intervened and Non-Intervened Claims and to Further Bifurcate Non-Intervened Claims, ECF No. 193.[2] After hearing from counsel and reviewing the record and relevant legal authority, the Court is fully informed. For the reasons set forth below, the Court denies Defendants' motions to dismiss the United States' claims, denies the Defendants' motions to dismiss the Relators' FCA claims relating to the IU2&6 Projects against WCH, FE&C, and PENW, and the Phoenix-ABC HUBZone contracts against WCH, FE&C, PENW, Phoenix-ABC, and ABC, grants the Defendants' motions to dismiss the Relator's other FCA and state-law claims, and grants Defendants' request to bifurcate the United States' claims from the Relators' claims, with the United States' claims proceeding to trial first.

///

///

///

///

//

---

[2] The Sage Tec Defendants joined the other Defendants' motions to dismiss. ECF No. 197.

ORDER - 4

/

**A.   Background**[3]

   The U.S. Department of Energy (DOE) manages and oversees clean-up of nuclear waste at the Hanford nuclear reservation.   ECF No. 157 ¶¶ 3.3 & 6.2.   Clean-up of the nuclear waste is a critical mission as many of the Hanford Site reactors and buildings used to conduct nuclear experiments and manufacture equipment were built in close proximity to the Columbia River and therefore there is a concern that nuclear waste is contaminating the Columbia River and the groundwater. *Id.* ¶ 6.3.

   In 2005, as part of the restoration and cleanup effort, DOE awarded the River Corridor Closure (RCC) Contract, Contract No. DE-AC-6-05RL 14655, to Washington Closure Hanford (WCH), a large business owned by URS Corporation, Bechtel National, Inc., and CH2M Hill Companies, Ltd. ECF No. 168 ¶ 3.12; ECF No. 157 ¶¶ 3.5 & 6.4. The RCC Contract was a multi-billion dollar, ten-year, cost-plus-incentive-fee prime contract, which reimbursed WCH for its incurred material and labor costs. ECF No. 157 ¶¶ 6.6 & 6.7. The United States paid WCH through a DOE-funded line of credit from which WCH drew down reimbursement of its incurred allowable costs. *Id.* WCH earned incentive fees in excess of its incurred costs through cost-

---

[3] The "background" section is based on the factual allegations contained in the Relator's Third Amended Complaint, ECF No. 168, and the United States' Complaint, ECF No. 157, which are assumed true at this time, *see Ashcroft v. Iqba*l, 129 S. Ct. 1937, 1949 (2009).

performance incentive fees and schedule-performance incentive fees. *Id.* As of December 2013, WCH had claimed and received $85,670,945 in incentive fees from the United States under the RCC Contract. *Id.* ¶ 6.8.

### 1. Subcontracting by WCH

To assist it with completing work required under the RCC Contract, WCH subcontracted much work to FE&C, a large business. ECF No. 168 ¶ 3.13. In addition to subcontracting work to large businesses, such as FE&C, WCH was statutorily required to engage in good-faith efforts to subcontract work to small businesses.[4] In fact, as a condition to being considered for the RCC Contract, WCH submitted its Small Business Subcontracting Plan ("Subcontracting Plan") to DOE, in which WCH established goals to subcontract work to small businesses, including woman-owned small businesses and other disadvantaged small businesses, consistent with the Small Business

---

[4] The WCH's prime contract included the following language, as set forth in 15 U.S.C. § 637(d)(1):

> It is the policy of the United States that small business concerns, small business concerns owned and controlled by veterans, small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women, shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency, including contracts and subcontracts for subsystems, assemblies, components, and related services for major systems.

*See* ECF No. 157 ¶ 5.7.

ORDER - 6

Act, 15 U.S.C. § 637, and Federal Acquisition Regulations (FAR) 52.219-8 and 52.219.9. ECF No. 168 ¶¶ 4.1 & 4.2; ECF No. 157 ¶¶ 5.8 & 6.9. In the Subcontracting Plan, WCH identified categories of projects for small businesses, including soils excavation and backfill.   ECF No. 168 ¶ 4.2.  A failure to abide by the Subcontracting Plan could constitute a material breach of the RCC Contract and could impose WCH to liquidated damages and reduced incentive-fee payments. ECF No. 157 ¶¶ 5.11, 6.10, & 6.11; ECF No. 168 ¶ 4.5.

Accordingly, there were financial incentives for WCH to subcontract work to small, disadvantaged businesses. Yet, FE&C desired to be awarded work as well. Therefore, beginning in 2009, Bernie Laverentz as FE&C's Vice President, and WCH's Contracting Officer Dennis Houston agreed to work toward setting up front companies (facades) for FE&C, whereby a façade small business would be awarded a small, disadvantaged business subcontract by WCH but FE&C would perform the subcontracted work and thereby financially profit from the work. ECF No. 168 ¶¶ 3.10 & 7.1. WCH benefitted from its favored relationship with FE&C and the façade small businesses as it would be able to report to DOE that it met its Subcontracting Plan small-business requirements and therefore avoid up to a $9 million penalty, while at the same time receive incentive fees. *Id.* ¶¶ 1.5 & 3.10.

The first two small businesses that Mr. Laverentz approached declined to serve as facades for FE&C. *Id.* ¶¶ 7.2-7.7. Mr. Laverentz then approached Jonetta Everano, who had been a WCH employee from 2004-2007 and thereafter was an FE&C employee. *Id.* ¶ 3.7. Ms. Everano agreed to begin a small business, which she named Phoenix Enterprises

ORDER - 7

NW, LLC (PENW), which would apply for RCC small-business subcontracts. *Id.* ¶ 3.14. PENW was owned 51% by Ms. Everano and 49% by FE&C. *Id.* ¶¶ 7.2-7.7; ECF No. 157 ¶ 6.14. Ms. Everano, who remained a full-time employee of FE&C, did not invest money in PENW but rather FE&C loaned most of the 51% interest to Ms. Everano out of PENW's future earnings. ECF No. 168 ¶¶ 7.8, 7.14, & 7.19. PENW had no assets, address, or telephone number.

### 2.    Truck and Pup Subcontract

In April 2009, WCH solicited requests for proposal (RFP) for the Truck and Pup Subcontract under the RCC Contract.[5] The project entailed transporting direct-loaded bulk materials from 100 Area Waste Sites to the Environmental Restoration Disposal Facility. ECF No. 168 ¶¶ 7.10 & 7.15; ECF No. 157 ¶ 6.13 (RFP number R009166A00). This RFP noted that the subcontract was a "set aside," meaning only disadvantaged small businesses, were eligible to bid on, be awarded, and perform the work. ECF No. 168 ¶ 7.15; ECF No. 157 ¶ 6.13. In May 2009, PENW submitted a proposal for the Truck and Pup Subcontract. Through this process, Ms. Everano certified that PENW was a small, woman-owned business eligible to compete for this small, disadvantaged business subcontract. ECF No. 157 ¶ 6.14; ECF No. 168 ¶ 7.20.

Salina Savage, the owner and principal officer of Savage Logistics, LLC, filed a protest with the Small Business Administration

---

[5] WCH delayed the posting of the Truck and Pup Subcontract until PENW completed its "small, woman-owned business" formation documents. ECF No. 168 ¶ 7.38.

(SBA) contending that PENW was not a small business because of its affiliation with FE&C and therefore not eligible to compete for the Truck and Pup Subcontract.[6] ECF No. 168 ¶¶ 3.1 & 7.24; ECF No. 157 ¶ 6.15. Notwithstanding the pending SBA protest, in June 2009, WCH awarded PENW the Truck and Pup Subcontract and entered this subcontract into its Costpoint accounting system as a small-business award. ECF No. 168 ¶ 7.23; ECF No. 157 ¶¶ 6.15 & 6.17.

Approximately ten days later, the SBA determined that PENW was not eligible for the Truck and Pup Subcontract because it was not a small, woman-owned business given its affiliation with FE&C. ECF No. 157 ¶ 6.16; ECF No. 168 ¶¶ 7.8 & 7.24. Notwithstanding the SBA's determination, WCH proceeded to award the Truck and Pup Subcontract to PENW, but it advised DOE that it would not claim any small-business credit for the Truck and Pup Subcontract, and WCH removed the Truck and Pup Subcontract as a small-business award in its Costpoint system. ECF No. 157 ¶ 6.18; ECF No. 157 ¶ 6.17; *see also* ECF No. ¶¶ 7.25 & 7.33. Based on the assurance that WCH would not take small-business credit for the Truck and Pup Subcontract, DOE permitted the Truck and

---

[6] Because Ms. Savage filed a protest with the Small Business Administration regarding PENW, WCH threatened Ms. Savage that it would not award Savage Logistics any subcontracts to perform work at the Hanford site if she brought forward claims that WCH wrongfully awarded subcontracts; WCH has failed to award any subcontracts to Savage Logistics since her challenge to the award of the Truck and Pup Subcontract to PENW. ECF No. 168 ¶¶ 1.13 & 7.26-28.

Pup Subcontract to PENW to stand even though the subcontract had not been competitively bid to large businesses as well.[7] ECF No. 157 ¶ 6.17; ECF No. 168 ¶ 7.35. Not only did PENW benefit from being awarded a contract that was not competitively bid, but PENW also obtained "insider" information from WCH and FE&C regarding the length of the hauling contract and therefore was able to bid a lower price than Savage Logistics, which was not privy to this information when it prepared its proposal. ECF No. 168 ¶ 7.37.

Modifications totaling over $2 million were later made to the Truck and Pup Subcontract. With full knowledge that PENW was not a small business for purposes of the Truck and Pup Subcontract, WCH awarded this Truck and Pup Subcontract modification work to PENW without a competitive bidding process and treated these subcontract modifications as small-business subcontracts on its semi-annual small business subcontract reports and balanced scorecards that WCH submitted to DOE in support of its contractual requirements regarding

---

[7] WCH's tactical decision to initially solicit bids for a small-business subcontract and then later change the designation of the subcontract to a non-restricted subcontract did not permit large businesses to compete for the Truck and Pup Subcontract, which resulted in higher bids and corresponding financial loss to the United States. ECF No. 168 ¶ 8.7; *see also* 15 U.S.C. § 632(w)(1) (Presumption of loss to the United States when a business other than a small business willfully sought and received a small-business award by misrepresentation).

ORDER - 10

the Subcontracting Plan. As a result of reporting these modifications as small-business subcontracts to DOE, WCH received incentive fees for its small-business subcontracts. ECF No. 157 ¶¶ 6.18-6.21 (see ¶ 6.21 for chart identifying specific Truck and Pup Subcontract modifications which were awarded to PENW and treated by WCH as subcontracts to small, woman-owned business, totaling almost $3 million). Furthermore, WCH knowingly claimed payment from DOE for Truck and Pup Subcontract work under the small-business classification. ECF No. 157 ¶¶ 6.22 & 7.33 (detailing monthly invoices).

During the work for the awarded Truck and Pup Subcontract and the modifications thereto, PENW and FE&C submitted billing invoices to WCH; these billing invoices represented that PENW was a small business. ECF No. 168 ¶ 7.40.

### 3. 100 IU2&6 Project

In approximately May 2009, WCH advertised a project set aside for small, disadvantaged businesses: the Remedial Action of the 100 IU 2 and 100 IU 6 Waste Sites ("100 IU2&6"). ECF No. 168 ¶ 7.46. During Ms. Savage's SBA size protest of PENW, WCH canceled the procurement for the 100 IU2&6 Project, but then proceeded to hold a site visit on the cancelled 100 IU2&6 Project. *Id.* ¶¶ 7.46 & 7.47.

Thereafter, WCH re-advertised the small, disadvantaged business subcontract for the 100 IU2&6 Project, but *only* to bidders who attended the site visit on the canceled procurement, which included PENW but not Savage Logistics. *Id.* ¶ 7.47. The contract for the 100 IU2&6 Project (contract #C011535AOO) was awarded to PENW on September 23, 2009, with knowledge by WCH that PENW was not a small, woman-owned

business, nor in a legal mentor-protégé relationship with FE&C, but rather merely serving as a façade for FE&C. *Id.* ¶ 7.49. Work, which was predominantly done by FE&C, totaling over $15 million was performed on the 100 IU2&6 Contract, and related modifications, until March 2011. *Id.* ¶ 7.53. In relation to this work, PENW submitted invoices and documents to WCH to receive payment under the small-business subcontract, and WCH in turn sent invoices and received payments from DOE for the small-business subcontract. *Id.* ¶ 7.53.

On September 1, 2009, WCH considered whether hauling work related to the 100 IU2&6 Project could be sole-sourced to PENW rather than bid out for competition. *Id.* ¶ 7.54.  On April 22, 2010, WCH signed a Non-Competitive (Sole Source) Justification Form, under FAR 52.244-2, for the 100 IU2&6 Project, contending that the schedule for the 100 IU2&6 Project was in jeopardy and therefore a sole-source contract to PENW for the related hauling was necessary. ECF No. 168 ¶¶ 7.55-7.57. The form prepared by WCH, stated:

> PENW is a small, disadvantaged, woman owned business with proven performance, safety and quality programs; and the experience required for the described services on this project.  In May 2009, PENW was awarded a competitively bid WCH transportation subcontract and over the past 12 months has developed a mature safety culture while performing this scope for WCH at several remedial waste sites (100H, 100D, and IU2&6).

ECF No. ¶ 7.59. WCH then took credit under its Subcontracting Plan with DOE for the IU2&6 Project: the initial IU2&6 Contract, the sole-source IU2&6 hauling contract, and modifications thereto (100-C-7 for Concrete Removal, 600 149 UXO and PU Vault Demolition, and 100 D & H), as awards to a small, woman-owned business, with full knowledge that

PENW was not a small, disadvantaged woman-owned business. ECF No. 168 ¶¶ 7.62-72; ECF No. 157 ¶ 7.2 (listing dates and contracts upon which WCH falsely claimed that PENW was a small business to DOE) & ¶ 7.4. Because of WCH's false representations regarding PENW, the United States, through DOE, paid money under the RCC Contract that it otherwise would not have. ECF No. 157 ¶ 7.5.

### 4.   Phoenix-ABC A Joint Venture

In the summer of 2010, PENW began a joint venture with Acquisition Business Consultants (ABC): Phoenix-ABC A Joint Venture ("Phoenix ABC"). ECF No. 168 ¶¶ 3.17 & 7.76. ABC was started by Jessica Morales in 2009 and was initially headquartered in Wasilla, Alaska. *Id.* ¶¶ 3.15 & 3.16.

Phoenix-ABC sought to qualify as a HUBZone contractor so that it could compete for HUBZone subcontracts at Hanford,[8] and participate in the WCH mentor-protégé program. However, neither PENW nor ABC nor Phoenix-ABC qualified as a HUBZone business. *Id.* ¶¶ 7.74-7.77. In

---

[8] The Small Business Reauthorization Act of 1997 created the HUBZone program, whereby a subcontract set aside for a HUBZone small business can be awarded to a contractor who qualifies as a HUBZone contractor. 13 C.F.R. § 126.200.  WCH's Subcontracting Plan incorporated FAR 52.219-9(e)(4), which requires WCH to confirm that a subcontractor, which represents itself as a HUBZone small business, is listed as a HUBZone small business on the Central Contractor Registration database or by contacting the Small Business Administration.  ECF No. 168 ¶ 6.4.

ORDER - 13

addition, neither PENW nor ABC had been in business for at least two years, a requirement of the mentor-protégé program.[9] *Id.* ¶ 7.77.

A question was sent to DOE regarding what the two-year requirement meant for each of the joint-venture participants, ABC and PENW. DOE responded: "Given that the firms that make up the joint venture individually have met the requirements of AL 2005-08 and DEAR 919.70, that then should suffice to enable the mutually desired arrangement to proceed." ECF No. 168 ¶ 7.82. However WCH, PENW, ABC, and Phoenix-ABC knew that the DOE's understanding that *both* PENW and ABC met the two-year requirement was erroneous; this error was not brought to DOE's attention by these entities. *Id.* ¶¶ 7.78-7.82

Nonetheless, Phoenix-ABC applied to be part of the mentor-protégé program, and was accepted. *Id.* ¶ 4.10. Thereafter, "mentor" WCH awarded a master contract C016925A00 without competition to "protégé" Phoenix-ABC without confirming that Phoenix-ABC qualified for HUBZone status with the CCR or the Small Business Administration. *Id.* ¶¶ 7.83 & 7.84, 7.89. This multi-million dollar contract was classified by WCH as a small woman-owned HUBZone business contract, thereby permitting WCH to reach its Subcontracting Plan HUBZone subcontracting goals. *Id.* ¶ 7.90.

---

[9] DOE regulations establish a qualified mentor-protégé program, and set out the requirements, including that an eligible protégé has to be an independent business that has been operating for at least two years prior to applying for enrollment in the mentor-protégé program. ECF No. 168 ¶ 4.10; 48 C.F.R. § 919.70.

ORDER - 14

5. **Sage Tec**

WCH's small-business collusion extended to another business that FE&C partnered with and performed work for: Sage Tec, LLC. ECF No. 168 ¶ 7.94; ECF No. 157 ¶¶ 6.24-6.105. Sage Tec was formed in February 2009, eight days after PENW was formed, and utilized the same business address as PENW (at that time), Phoenix-ABC A Joint Venture, and FE&C. Laura Shikashio, who is the wife of FE&C's Vice President of Construction Services, Larry Burdge, is the owner, president, and sole employee of Sage Tec. ECF No. 168 ¶¶ 3.19 & 7.85.

On May 18, 2010, WCH issued RFP No. R015600A00 for Remedial Action for 100-C-7 and 100-C-7:1 Waste Sites ("100 Area RFP") on a restricted basis to small, disadvantaged businesses. ECF No. 157 ¶ 6.28. The subcontract contemplated in the 100 Area RFP required a subcontractor to furnish all management, supervision, labor, facilities, equipment, tools, materials, and supplies necessary to complete the scope of work. *Id.* ¶ 6.30. WCH provided a prequalification questionnaire to potential small-business vendors, which among other things, required the potential offerors to have at least three years of experience performing earthwork and grading work and two years of experience handling waste. *Id.* ¶ 6.31.

Sage Tec submitted its commercial and technical proposals for the 100 Area project to WCH on July 19, 2010. ECF No. 157 ¶¶ 6.36 & 6.48. Sage Tec's 100 Area Technical Proposal did not describe either Sage Tec's or Ms. Shikashio's ability to perform the sought-after subcontracted work but advised that it would partner with FE&C. *Id.* ¶ 6.40. As part of this proposal, Ms. Shikashio signed a Representations

ORDER - 15

and Certifications, falsely claiming that Sage Tec was a woman-owned small business and would so act if awarded the contract. *Id.* Sage Tec submitted its best and final offer to WCH on August 12, 2010, and then submitted a revised commercial proposal on November 2, 2010. *Id.* ¶ 6.51.

WCH evaluated Sage Tec's and the other four offerors' proposals. *Id.* ¶¶ 6.36 & 6.47. Despite knowing that Sage Tec was merely lending its small, woman-owned business name and status to the 100 Area Project, WCH entered into the 100 Area Subcontract (Subcontract No. C015600A00) in December 2010 with Sage Tec, a contract worth over $4 million. ECF No. 168 ¶ 7.96; ECF No. 157 ¶¶ 6.27, 6.41, 6.54, & 6.55. WCH knew that Sage Tec was a façade for FE&C and not a small, woman-owned business because:

- Sage Tac had no relevant experience in handling nuclear waste;

- Sage Tec had no equipment;

- Sage Tec had no employees other than Ms. Shikashio, who has a degree in social sciences;

- Sage Tec merely adopted FE&C's Quality Assurance Program, having none of its own; and

- Several FE&C personnel were listed by Sage Tec in its 100 Area Technical Proposal as those who would hold management and supervisory positions on the subcontract if Sage Tec was awarded the project.[10]

---

[10] An email sent by a WCH employee in April 2011 recognizes the true nature of Sage Tec and FE&C's relationship and the fact, which all WCH

ORDER – 16

ECF No. 157 ¶¶ 6.34, 6.40, 6.42, & 6.43. WCH also knew that Sage Tec, which had explicitly advised that it was a new business, did not satisfy the yearly requirements that WCH required for a potential offeree on the 100 Area RFP. ECF No. 157 ¶¶ 6.29-6.34.

Yet, WCH falsely represented to DOE that Sage Tec was the technically acceptable, responsive, responsible offeree with the lowest evaluated price. *Id.* And as was apparent during WCH's review of Sage Tec's proposal, FE&C has performed the majority of the work that was awarded to Sage Tec. ECF No. 168 ¶ 7.97. By using employees from FE&C, Sage Tec merely paid invoices from FE&C for the charge out rate of any of FE&C's employees used by Sage Tec; FE&C continued to pay the full wages and benefits of any of their employees used by Sage Tec. ECF No. 157 ¶ 6.58.

Later in 2012, WCH awarded another multimillion dollar subcontract to Sage Tec, with full knowledge again that FE&C employees would perform the work, which included safely removing radiological and chemical waste sites, pipelines, tank farms, and below grade structures, by utilizing FE&C equipment. *Id.* ¶¶ 6.62-6.64 & 6.73-6.77.

knew, that Sage Tec was not providing its own equipment or employees to perform the 100 Area Subcontract:

> Sage Tec is proposing a 7.5% fee for passing through FE&C's bid. . . I think it is reasonable to negotiate a lower rate since they are not adding any value to the contract other than a small business name. . . That is something the Doug will need to negotiate . . . since we do not have authority to do so.

ECF No. 157 ¶ 6.57 (ellipses in original); *see also id.* ¶¶ 6.56 6.59, & 6.61.

This project was advertised by WCH in its 300 Area Request for Proposal (RFP No. R025228A00) and was set aside by WCH for small, disadvantaged businesses. *Id.* ¶¶ 6.65 & 6.66. WCH made this RFP available to eight of nine businesses that WCH had prequalified, including Sage Tec and PENW.  *Id.* ¶ 6.66. From this group of pre-qualified businesses, WCH received proposals from Sage Tec and one other company. *Id.* ¶ 6.67.

In connection with Sage Tec's proposal, Ms. Shikashio submitted written Clarification No. 1, which stated:

> Sage Tec LLC, as the lead Offeror on this RFP, shall be responsible for performing approximately 26.8% of the total amount of the Base Work with its own organization.  Listed below are the major Base Work task areas for which Sage Tec will perform in part or in whole:
>
> - Mobilization Submittals
> - Mobilization/Set Up
> - Demobilization
> - Key Personnel
> - Design
> - Civil Surveying
> - Engineering
> - Insurance
> - Bonding

ECF No. 157 ¶ 6.92.  WCH knew that the assertion that Sage Tec would perform 26.8% of the work was false based on Sage Tec's lack of equipment and lack of employees (other than Ms. Shikashio) and working arrangement with FE&C. *Id.* ¶¶ 6.93-6.95. WCH knew that Sage Tec would simply again act as a facade for FE&C, providing its woman-owned small business status to FE&C. *Id.* ¶¶ 6.81, 6.82, & 6.98. Because of Sage Tec's reliance on FE&C, it was able to submit an offer that was $6 million lower than the other offer. *Id.* ¶ 6.96. On October 2012, WCH

entered into the 300 Area Subcontract (Subcontract No. C025228A00) with Sage Tec for over $15 million. *Id.* ¶¶ 6.99-6.102, 6.105.

Sage Tec submitted monthly and final invoices to WCH in order to receive payment for work completed during the 100 and 300 Area Subcontracts. *Id.* ¶¶ 7.15-7.18. These false claims for payment to WCH were ultimately paid or reimbursed by DOE to WCH. *Id.* ¶¶ 7.19-7.21. Yet, without Sage Tec's false and/or fraudulent representations on its 100 Area Technical and Commercial Proposals and its 300 Area Technical and Commercial Proposals, regarding its classification as a woman-owned small business, which would perform at least 15% of the work, DOE would not have paid the money it did under the RCC Contract. ECF No. 157 ¶¶ 7.6-7.9, 7.11-7.15, & 7.33 (identifying WCH's monthly invoices and associated drawdowns against DOE line of credit).

### 6. Impact on DOE

Under the RCC Contract, WCH provided DOE with semi-annual small business subcontract reports every six months in order to update DOE as to WCH's progress in meeting the goals established in the Subcontracting Plan. ECF No. 157 ¶¶ 7.24 & 7.25 (identifying each semi-annual small business subcontract report that contains a false and/or fraudulent record or statement). Also as required by the RCC Contract, WCH provided DOE with balanced scorecards for each fiscal year. ECF No. 157 ¶ 7.29. DOE understood WCH to have awarded the identified subcontracts to the identified small businesses in these reports and scorecards, and therefore did not charge WCH a fee reduction but rather paid WCH incentive fees for reaching its small-

1   business subcontracting goals.  ECF No. 157 ¶¶ 7.29-7.32 & 7.37-7.39

2   (listing WCH quarterly fee invoices).

3       **7.   Lawsuits**

4       The Relators, Salina Savage and Savage Logistics, initiated this

5   False Claims Act (FCA) qui tam lawsuit in 2010. ECF No. 1. Pursuant to

6   federal statute, this lawsuit was initially sealed to permit the

7   United States an opportunity to investigate and decide whether it

8   would intervene before Defendants were served with the Relators'

9   complaint.  The United States initially declined to intervene in 2011,

10  ECF No. 7, and the qui tam lawsuit proceeded against the then-named

11  Defendants WCH, Mr. Houston, FE&C, Mr. Laverentz, PENW, and Ms.

12  Everano.  Discovery proceeded and motions for summary judgment were

13  filed.

14      Before the summary-judgment motions were ruled on, the Relators

15  amended their complaint to add FCA claims as to Phoenix-ABC, ABC, Ms.

16  Morales, Sage Tec, and Ms. Shikashio.  ECF No.  140. In August 2013,

17  the United States elected to intervene in part, asserting the

18  following claims: 1) WCH and FE&C violated the FCA by falsely

19  claiming, or causing to be submitted, small business credit for

20  modifications on the Truck & Pup Subcontract held by PENW, 2) WCH,

21  Sage Tec, and Ms. Shikashio violated by the FCA by knowingly

22  submitting false claims to DOE whereby WCH falsely claimed woman-owned

23  small business credit for 100 Area and 300 Area subcontracting work,

24  3) WCH breached the RCC Contract by failing to comply or carry out in

25  good faith the Subcontracting Plan, and 4) unjust enrichment and

26

payment-by-mistake against Defendants WCH, FE&C, Sage Tec, and Ms. Shikashio. ECF No. 157.

The Relators were given leave to file an amended complaint in light of the United States' intervention decisions. ECF No. 166. On January 10, 2014, the Relators filed their Third Amended Complaint (TAC), pursuing their FCA claims as to matters that were not intervened in by the United States against WCH, Mr. Houston, FE&C, Mr. Laverentz, PENW, Ms. Everano, ABC, Phoenix-ABC, and Ms. Morales. ECF No. 168. In addition to FCA claims against the Defendants, Relators assert 1) Defendants WCH, Mr. Houston, FE&C, Mr. Laverentz, PENW, and Ms. Everano intentionally interfered with a contract, 2) Defendants violated Washington's Consumer Protection Act, RCW 19.86 et al, and 3) WCH retaliated against Savage Logistics. *Id.*

All Defendants seek dismissal of both the United States' complaint and the Relators' TAC under Federal Rule of Civil Procedure 12(b)(6) for the complaints' purported failure to comply with Rule 8 and Rule 9(b)'s pleading standards. Briefing and oral argument ensued.

**B.   Dismissal**

**1.   Standard**

Defendants seek dismissal of the Relators' and the United States' complaints under Federal Rule of Civil Procedure 12(b)(6). A Rule 12(b)(6) motion to dismiss challenges whether the complaint satisfies pleading standards. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Here, the pleading standards are governed by both Rule 8 and Rule 9(b).

1    Rule 8 requires the complaint to contain "a short and plain

2    statement of the claim showing that the pleader is [plausibly]

3    entitled to relief." Fed. R. Civ. P. 8(a)(2); *see Bell Atl. Corp. v.*

4    *Twombly*, 550 U.S. 544, 570 (2007) (setting forth the plausibility

5    standard).  Plausibility does not require a probability of success on

6    the merits; instead it requires "more than a sheer possibility" of

7    success on the merits.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

8    To determine whether the complaint contains a statement showing

9    that the pleader is plausibly entitled to relief, the court first

10   identifies the elements of the plaintiff's claim and then determines

11   whether those elements can be proven on the alleged facts. *Id.* at 663.

12   When conducting this analysis, the court accepts the alleged factual

13   allegations in the complaint as true and construes the pleadings in

14   the light most favorable to the plaintiff, and considers judicially

15   noticeable documents and contracts referenced in the complaint, but

16   the court may disregard factual allegations that are contradicted by

17   matters properly subject to judicial notice or filed exhibits.

18   *Sheppard v. David Evans & Assocs.*, 694 F.3d 1045, 1051 (9th Cir.

19   2012); *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir.

20   2001); *see Lee v. City of Los Angeles*, 250 F.3d 668, 688-89 (9th Cir.

21   2001) (identifying what documents a court can consider at the Rule

22   12(b)(6) stage).

23   Defendants also argue that the complaints fail to satisfy Rule

24   9(b)'s particularity requirement. Rule 9(b) requires a complaint to

25   "state with particularity the circumstances constituting fraud or

26   mistake." Fed. R. Civ. P. 9(b). To satisfy this standard, the fraud-

based claims must "be specific enough to give defendants notice of the particular misconduct so that they can defend against the charge and not just deny that they have done anything wrong." *Vess v. CibaGeigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003) (quotation and citation omitted). Thus, "[a]verments of fraud must be accompanied by the who, what, when, where, and how of the misconduct charged." *Id.* (quotation and citation omitted). A party may, however, plead allegations of "[m]alice, intent, knowledge, and other conditions of a person's mind more generally." Fed. R. Civ. P. 9(b).

### 2. Authority and Analysis

With these standards in mind, the Court turns to analyzing the sufficiency of the plead claims.

#### a. FCA Claims

Both the United States and the Relators allege False Claims Act (FCA) violations. The Relators agree that for those FCA claims being pursued by the United States through its intervention the Relators are no longer the party litigating those claims.[11] The Relators continue their FCA claims to which the United States did not intervene. The Court focuses its FCA analysis first on the United States' FCA claims.

##### i. United States' FCA Claims

The United States asserts the following FCA claims: 1) WCH, Sage Tec, and Ms. Shikashio violated the FCA through the process of WCH

---

[11]    Even though the Relators may not litigate the intervened claims, the Relators may recover 15-25% of the amount recovered by the United States. *See* 31 U.S.C.A. § 3730(d).

ORDER - 23

awarding small-business contracts to Sage Tec, which these Defendants knew was not a small business but rather a facade for FE&C, whereby Sage Tec and FE&C received payment on the subcontracted work and WCH took and received small-business credit from DOE for these subcontracts, and 2) WCH and FE&C violated the FCA through the 2009 Truck and Pup Subcontract modifications as they knew that PENW was a small-business façade for FE&C, but WCH nonetheless awarded the small-business modifications to PENW and then took small-business credit for Modifications 2 through 5. These Defendants contend that the complaint fails to allege sufficient facts to satisfy the FCA's scienter, materiality, and causation requirements.

A defendant is liable under the FCA if it: "knowingly presents or causes to be presented, a false or fraudulent claim for payment or approval," 31 U.S.C. § 3739(a)(1)(A), or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," *id.* § 3739(a)(1)(B). This FCA analysis requires the satisfaction of a number of elements: 1) knowledge (scienter), 2) presentation (or making or use, or causes such action) of a false or fraudulent claim or statement, and 3) materiality.

As to knowledge, a defendant acts knowingly if it has actual knowledge, deliberate ignorance of the statement, or reckless disregard as to the truth of the statement. *Id.* § 3729(b)(1). "Innocent mistakes, mere negligent misrepresentations and differences in interpretations" do not constitute knowingly false statements. *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1267 (9th Cir. 1996).

1    The falsity requirement is satisfied if it is an "intentional,

2 palpable lie." *Id*. A claim is "any request or demand, whether under a

3 contract or otherwise, for money or property and whether or not the

4 United States has title to the money or property," presented to the

5 United States or to a contractor, if the money or property is to be

6 spent or used on the United States' behalf. 31 U.S.C. § 3729(b)(2). A

7 false statement or course of conduct is material if it impacts the

8 government's decision to pay out moneys to the claimant. *United States*

9 *ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1172 (9th Cir.

10 2006).

11    Case law indicates that these FCA elements can be satisfied

12 through either an express false certification or an implied false

13 certification—both which are alleged in the complaints here. An

14 express false certification occurs when a defendant certifies

15 compliance with a law, rule, or regulation as part of the process

16 through which the claim for payment is submitted. *Ebeid ex rel. United*

17 *States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010). An implied

18 false certification occurs when an entity has previously undertaken to

19 expressly comply with a law, rule, or regulation, and that obligation

20 is implicated by submitting a claim for payment even though a

21 certification of compliance is not required in the process of

22 submitting the claim. *Id*. To prove either means of a false

23 certification, the plaintiff is not required to "identify

24 representative examples of false claims to support every allegation,"

25 rather "use of representative examples is simply one means of meeting

26 the pleading obligation" to allege "'particular details of a scheme to

1    submit false claims paired with reliable indicia that lead to a strong

2    inference that claims were actually submitted.'" *Id.* at 998-99

3    (quoting *United States ex rel. Grubbs v. Kanneganti*, 565 F.3d 180, 190

4    (5th Cir. 2009)).

5        Focusing first on the Sage Tec-related FCA claim, the United

6    States has identified the proposals, subcontracts, modifications,

7    invoices, and other documents wherein it claims that the respective

8    Defendant presenting that document (or causing it to be submitted)

9    either expressly or impliedly misrepresented that Sage Tec was a small

10   business. The United States identifies that Sage Tec made false or

11   fraudulent records or statements pertaining to its purported small,

12   disadvantaged business status on the Technical and Commercial

13   Proposals under the 100 Area and 300 Area RFPs, and its invoices to

14   WCH. As to WCH, the United States alleges that WCH made false or

15   fraudulent records or statements pertaining to Sage Tec's purported

16   small, disadvantaged business status on the 300 Area Subcontract, its

17   semi-annual small business subcontract reports, its balanced scorecard

18   reports, monthly invoices, and quarterly invoices for Interim Fee

19   Payments. The United States also alleges that FE&C, Sage Tec, and Ms.

20   Shikashio caused to be submitted the WCH monthly invoices from and

21   including November 2010 forward. The allegations in the United States'

22   complaint pertaining to this Sage-Tec scheme are pled with sufficient

23   particularity as to put each of these Defendants on notice of the

24   alleged fraudulent claim and their involvement in such fraudulent

25   claim. Finally, the United States alleges that the express and implied

26   false claims and statements regarding Sage Tec's small business status

and the work it was purportedly performing under the awarded small business contracts were material to the United States' payment of monies under the RCC contract to WCH. Accordingly, the Court **denies** the motions to dismiss as to the United States' FCA claims against Defendants WCH, FE&C, Sage Tec, and Ms. Shikashio related to Sage Tec.

As to the United States' FCA claims against WCH and FE&C relating to the Truck and Pup Subcontract modifications, the Court finds these allegations are sufficiently pled. Table 7.2 in the United States' complaint identifies each RFP wherein the United States claims that WCH and FE&C falsely claimed that PENW was a small business to DOE. ECF No. 157. The United States also alleges that both WCH and FE&C submitted, or caused these false claims to be submitted, to DOE, and these false claims were material to DOE's payment on the monthly invoices and quarterly fee invoices. Accordingly, the Court **denies** the motions to dismiss as to the United States' FCA claims against WCH and FE&C relating to the Truck and Pup Subcontract modifications.

### ii.    The Relators' Non-Intervened FCA Claims

The Relators seek to pursue their non-intervened FCA claims, which pertain to the 1) initial Truck and Pup Subcontract awarded to PENW (brought against WCH, Mr. Houston, FE&C, Mr. Laverentz, PENW, and Ms. Everano), 2) the 100 IU2&6 Project awarded to PENW (brought against WCH, Mr. Houston, FE&C, Mr. Laverentz, PENW, and Ms. Everano), and 3) Phoenix-ABC's HUBZone contract awards (brought against WCH, Mr. Houston, FE&C, Mr. Laverentz, PENW, Ms. Everano, ABC, Phoenix-ABC, and Ms. Morales).

Beginning with the initial Truck and Pup Subcontract, the Court determines the TAC fails to plead a FCA claim as to the initial award of the Truck and Pup Subcontract to PENW. The TAC does identify that PENW and Ms. Everano completed a bid for the Truck and Pup Subcontract, which contained a false certification that PENW was eligible to compete for the contract, which was set aside for a small, disadvantaged business. However, after the SBA determined that PENW was not a small business for purposes of this award, WCH did not take small-business credit for this initial Truck and Pup Subcontract. Therefore, any invoices submitted by PENW, FE&C, and WCH in relation to the initial Truck and Pup Subcontract award did not cause the United States to pay out monies to these entities with the mistaken belief that the Truck and Pup Subcontract was set aside for a small business. Accordingly, the Court finds that the TAC fails to satisfy Rule 8 in regard to the initial Truck and Pup Subcontract and dismisses this claim.[12]

In relation to the 100 IU 2&6 Project, the Court finds the TAC alleges with sufficient particularity an FCA claim against PENW, FE&C, and WCH. The TAC identifies that PENW submitted a bid for the IU2&6 Project in which it identified itself as a small, disadvantaged business, that PENW, FE&C, and WCH sent invoices for work performed on this small-business set aside contract, that WCH completed forms

---

[12] This ruling does not impact the relevance of the initial Truck and Pup Subcontract and the related agreements and actions of the parties to the later Truck and Pup Subcontract modifications.

justifying sole-sourcing work to PENW knowing that the schedule was not in jeopardy, and that WCH took credit under its Subcontracting Plan for the cost of the 100 IU2&6 remediation contract and the sole-source 100 IU2&6 transportation contract. The TAC identifies these false or fraudulent misrepresentations as being material to the United States' payment of monies. In this regard, Defendants' motions to dismiss are **denied**. However, the TAC does not identify with sufficient particularity that Ms. Everano, Mr. Houston, or Mr. Laverentz made (or caused to be made) a false or fraudulent misrepresentation pertaining to the 100 IU2&6 Project; therefore, the Relators' 100 IU2&6 Project FCA claim is **dismissed** as to these Defendants.

Finally, as to the TAC's FCA claim pertaining to the Phoenix-ABC's HUBZone contracts, which are brought against WCH, Mr. Houston, FE&C, Mr. Laverentz, PENW, Ms. Everano, ABC, Phoenix-ABC, and Ms. Morales, the Court finds the claim is pled with sufficient particularity as to WCH, PENW, ABC, and Phoenix-ABC, but not as to Mr. Houston, FE&C, Mr. Laverentz, Ms. Everano, or Ms. Morales. The TAC identifies that WCH awarded Phoenix-ABC the identified contract without any competition and that the contract was for a small woman-owned HUBZone business, and alleges that WCH and Phoenix-ABC (and its co-venturers) knew that Phoenix-ABC did not qualify as a small woman-owned HUBZone business. The allegations sufficiently identify that Phoenix-ABC (and its co-venturers) knowingly made or caused to be made, a false statement regarding its business entity that was material to a fraudulent claim for payment under the awarded contract, and that WCH also knowingly presented or caused to be presented, a

false or fraudulent claim for payment or approval from DOE relating to the HUBZone contracts. In this regard, Defendants' motions to dismiss are **denied.** The TAC fails however to pled with particularity that Mr. Houston, FE&C, Mr. Laverentz, Ms. Everano, and Ms. Morales were the individuals or entity that made the false claims relating to this HUBZone FCA claim. In this regard, these Defendants' motions to dismiss this HUBZone FCA claim are **granted**.

### b. The USAO's Non-FCA Claims

The USAO also asserts 1) that WCH breached the RCC Contract by failing to comply or carry out in good faith the Subcontracting Plan, and 2) an unjust-enrichment claim and a payment-by-mistake claim against WCH, FE&C, Sage Tec, and Ms. Shikashio. These Defendants submit that the unjust-enrichment and payment-by-mistake claims must be dismissed because there is a governing express contract. The Court declines at this stage to dismiss the unjust-enrichment and payment-by-mistake claims. Discovery and further dispositive motions are necessary to determine whether these claims are duplicative of the breach-of-contract claim against WCH. *See Vernon v. Quest Comms. Intern, Inc.*, 643 F. Supp. 2d 1256 (W.D. Wash. 2009). Accordingly, in this regard, the Defendants' motions to dismiss are **denied.**

### c. The Relators' Non-FCA Claims

#### i. Intentional Interference with Contract Claim

The Relator asserts an intentional-interference-with-contract claim. To state a claim for tortious interference with a contractual relationship or business expectancy, the complaint must allege: "[1] the existence of a valid contractual relationship or business

expectancy; [2] that defendants had knowledge of that relationship; [3] an intentional interference inducing or causing a breach or termination of the relationship or expectancy; [4] that defendants interfered for an improper purpose or used improper means; and [5] resultant damages." *Leingang v. Pierce Cty. Med. Bureau Inc.*, 131 Wn.2d 133, 156-57 (1997).

Under the facts alleged in the Relators' complaint, the Court finds that a valid contractual relationship or business expectancy is missing. The Relators did not have a contractual right or business expectancy to be awarded the Truck and Pup Subcontract (or modifications thereto) or the other subcontracts at issue in this lawsuit. "An invitation to bid on a public contract is not an offer to contract but a solicitation for an offer." *Hadaller v. Port of Chehalis*, 97 Wn. App. 750, 755-56 (1999). Accordingly, the Relators' bid, or potential bid, on a public contract did not create a contractual relationship or expectancy. Accordingly, the Court **grants** Defendants' motions to dismiss the Relators' claim for intentional interference with a contract.

### ii.  Consumer Protection Act, RCW 19.86

The Relators allege that Defendants violated Washington's Consumer Protection Act (CPA), RCW 19.86. To state a CPA claim, the Relators must show "an unfair or deceptive act or practice; occurring in trade or commerce; public interest impact; injury to the plaintiff in his or her business or property; [and] causation." *Hangman Ridge Training Stables, Inc. v. Safeco Title Ins. Co.,* 105 Wn.2d 778, 780 (1986) (numbering of elements omitted). All elements must be present;

a finding that any element is missing is fatal to the claim. *Id.* at 793.

At dispute is whether the Relators' complaint alleges sufficient facts to satisfy the public-interest factor, i.e., whether the alleged acts had the capacity to deceive a substantial portion of the public. *See Goodyear Tire & Rubber Co. v. Whiteman Tire, Inc.*, 86 Wn. App. 732, 744 (1997). "When the transaction is a private dispute . . . and not a consumer transaction, it is more difficult to show public interest in the subject matter. There must be a likelihood additional persons have been or will be injured in the same fashion." *Id.* "[C]onduct that is not directed at the public, but, rather, at a competitor, lacks the capacity to impact the public interest in general. *Evergreen Moneysource Mortg. Co. v. Shannon*, 167 Wash. App. 242, 261 (2012).

The Court finds the Relators' complaint fails to satisfy the CPA's public-interest requirement. WCH's, FE&C's, and the façade subcontractors' conduct of allegedly conspiring in order to permit FE&C to perform the contracted work with the small business serving as a façade, thereby financially benefitting the involved businesses, is conduct that is not directed at the public, but rather is aimed at the competing proposing subcontractors. Although the alleged unfair practice relates to work on a public project, the unfair practice lacks the capacity to impact the public in general. Defendants' alleged false statements and/or misrepresentations were directed at DOE, not American consumers. Furthermore, given that very few businesses compete for these Hanford-area related contracts, which

require much technical skill and experience, this is not bidding
process that is directed at the public.

Thus, the Relators' complaint fails to satisfy the CPA's public-
interest element.   Accordingly, the Relators' CPA claim is **dismissed**.

### iii. Retaliation

In the TAC, the Relators allege a claim for retaliation under 31
U.S.C. § 3730(h) against WCH.   At the August 2014 hearing, Relators'
counsel advised that the Relators are voluntarily dismissing this
claim.   Accordingly, the WCH Defendants' motion to dismiss is **granted**
in this regard.

## C.   Bifurcation

WCH Defendants ask the Court to bifurcate the case into three
separate trials: 1) Trial 1 to resolve the Relators' claims pertaining
to the Truck and Pup Contract that were not intervened by the United
States; 2) Trial 2 to resolve the Relators' claims pertaining to
Phoenix-ABC and its eligibility to participate in the DOE Mentor-
Protégé Program and as a HUBZone concern that were not intervened by
the United States; and 3) Trial 3 to resolve the United States' claims
pertaining to the modifications to the Truck and Pup Contract and Sage
Tec.[13] ECF No. 193 at 1. The WCH Defendants propose the Relators' non-
intervened claims (proposed Trials 1 and 2) should proceed to trial
before the United States' claims because of the extensive litigation

---

[13]   WCH Defendants' bifurcation motion is joined by the Sage Tec
Defendants, ECF No. 210; the ABC Defendants, ECF No. 208; the FE&C
Defendants, ECF No. 207; and the PENW Defendants, ECF No. 206.

1    and discovery already done for those claims. *Id.* The Relators

2    recommend that discovery should proceed in this case on one track but

3    agrees with the United States' request to bifurcate the case for

4    trial: intervened claims and non-intervened claims, with the United

5    States' claims proceeding first to trial. ECF Nos. 204 & 205.

6         A court possesses the discretion to bifurcate trial "[f]or

7    convenience, to avoid prejudice, or to expedite and economize." Fed.

8    R. Civ. P. 42(b); *see Hangarter v. Provident Life & Acc. Ins. Co.*, 373

9    F.3d 998, 1021 (9th Cir. 2004) ("Rule 42(b) . . . confers broad

10   discretion upon the district court to bifurcate a trial, thereby

11   deferring costly and unnecessary proceedings . . . ." (internal

12   quotations and citations omitted)); *Chicago, R.I. & P.R. Co. v.*

13   *Williams*, 245 F.2d 397, 404 (8th Cir. 1957) (same); *Bowie v. Sorrell*,

14   209 F.2d 49, 51 (4th Cir. 1953) (same).

15        Because the Court dismissed the Relators' claims pertaining to

16   the initial Truck and Pup Subcontract, trifurcation is now moot. After

17   considering each parties' position and arguments in support thereof,

18   the Court concludes that bifurcation of the United States' claims and

19   the Relators' remaining claims are appropriate, with the United

20   States' claims proceeding first to trial. In light of the narrowed

21   remaining claims, the Court believes that discovery should proceed on

22   one track as to all claims.   However, the Court encourages briefing

23   from the parties regarding discovery and pretrial motions.

24   **D.   Conclusion**

25        For the above-given reasons, the Court permits the United

26   States' claims to continue (and will proceed to trial first): the FCA

claim related to Sage Tec against WCH, FE&C, Sage Tec, and Ms. Shikashio, the FCA claim related to the Truck and Pup Subcontract modifications 2-5 against WCH and FE&C, and the pled non-FCA claims; and the Court permits the Relators' following claims to continue: the FCA claim related to the 100 IU2&6 Project against WCH, FE&C, and PENW, and the FCA claim related to HUBZone contracts against WCH, PENW, ABC, and Phoenix-ABC. In summary, **IT IS HEREBY ORDERED**:

1. The WCH Defendants' Motion to Dismiss Relator's Third Amended Complaint, **ECF No. 183**, is **DENIED IN PART** (FCA claim pertaining to the 100 IU2&6 Project and Phoenix-ABC HUBZone contracts as to WCH) **AND GRANTED IN PART** (FCA claim pertaining to the initial Truck and Pup Subcontract for both WCH Defendants, FCA claims pertaining to the 100 IU2&6 Project and Phoenix-ABC HUBZone contracts as to Mr. Houston, and state-law claims).

2. The WCH Defendants' Motion to Dismiss the United States' Complaint in Intervention, **ECF No. 194**, is **DENIED**.

3. The FE&C Defendants Motion to Dismiss Relators Third Amended Complaint, **ECF No. 195**, is **DENIED IN PART** (FCA claims pertaining to the 100 IU2&6 Project and Phoenix-ABC HUBZone contracts as to FE&C) **AND GRANTED IN PART** (FCA claim pertaining to the initial Truck and Pup Subcontract for both FE&C Defendants, FCA claims pertaining to the 100 IU2&6 Project and Phoenix-ABC HUBZone contracts as to Mr. Laverentz, and state-law claims).

4.    The FE&C Defendants' Motion to Dismiss U.S.'s Truck and Pup
      Subcontract Claims, **ECF No. 196**, is **DENIED.**

5.    The PENW Defendants' Motion to Dismiss Plaintiffs' Third
      Amended Complaint, **ECF No. 185**, is **DENIED IN PART** (FCA
      claim pertaining to the 100 IU2&6 Project as to PENW, and
      Phoenix-ABC HUBZone contracts as to PENW and Phoenix-ABC)
      **AND GRANTED IN PART** (FCA claim pertaining to the initial
      Truck and Pup Subcontract for both PENW Defendants, FCA
      claims pertaining to the 100 IU2&6 Project and Phoenix-ABC
      HUBZone contracts as to Ms. Everano, and state-law claims).

6.    The ABC Defendants' Motion to Dismiss Plaintiffs' Third
      Amended Complaint, **ECF No. 198**, is **DENIED IN PART** (FCA
      claim pertaining to Phoenix-ABC HUBZone contracts as to
      ABC) **AND GRANTED IN PART** (FCA claim pertaining to Phoenix-
      ABC HUBZone contracts as to Ms. Morales, and state-law
      claims).

7.    The WCH Defendants' Motion to Bifurcate Intervened and Non-
      Intervened Claims and to Further Bifurcate Non-Intervened
      Claims, **ECF No. 193**, is **GRANTED IN PART** (bifurcation) **AND
      DENIED IN PART** (order of trials).

8.    Within **three weeks of entry of this Order**, the parties
      shall submit joint or individual notices regarding proposed
      dates for discovery and trial, and any other matter
      regarding the efficient resolution of this lawsuit.

9.    The case caption shall be amended to reflect the remaining
      Defendants and the separate:

UNITED STATES OF AMERICA, *ex rel.*, SALINA SAVAGE, SAVAGE LOGISTICS, LLC,

                Plaintiffs,

      v.

WASHINGTON CLOSURE HANFORD LLC; FEDERAL ENGINEERS AND CONSTRUCTORS, INC.; PHOENIX ENTERPRISES NW, LLC; PHOENIX-ABC JOINT VENTUTE; and ACQUISITION BUSINESS CONSULTANTS,

                Defendants,
_____

UNITED STATES OF AMERICA, *ex rel.*, SALINA SAVAGE, SAVAGE LOGISTICS, LLC,

           United States as Intervening Plaintiff,

      v.

WASHINGTON CLOSURE HANFORD LLC; FEDERAL ENGINEERS AND CONSTRUCTORS, INC.; SAGE TEC LLC; and LAURA SHIKASHIO,

                Defendants.

///

///

///

//

/

    **IT IS SO ORDERED**.  The Clerk's Office is to enter this Order and provide a copy to counsel.

    **DATED** this 6th day of October 2015.


                _____
                    s/Edward F. Shea
                    EDWARD F. SHEA
          Senior United States District Judge